John Powel *v.* Thomas G. Burke et al.

Cotter, C. J., Bogdanski, Longo, Peters and Parskey, Js.

Argued May 3—decision released July 17, 1979

*David S. Maclay,* for the appellants (defendants).

*Samuel J. Henderson,* with whom, on the brief, was *Mark S. Shipman,* for the appellee (plaintiff).

PETERS, J. This case concerns the sale of an accounting business. This suit by the plaintiff seller sought recovery from the defendants, the purchasers of the business, of amounts allegedly due under the contract of sale. After a trial before a state referee, the court found all disputed issues for the plaintiff and rendered judgment in his favor for $23,254. The defendants have appealed, assigning error to several aspects of the court's interpretation of the contract for sale between the parties, and to the court's denial of the defendants' motion to amend their answer.

All parties to this action are certified public accountants. The plaintiff, John Powel, prior to June, 1963, owned and operated an accounting business in Bridgeport; the defendants, Thomas G. Burke, Alfred Hollis and B. James Burke, doing business as Thomas G. Burke & Company, conducted an accounting business in New York City with an office in Westport. In June, 1963, the plaintiff took a job in New York and offered to sell his accounting practice to the defendants. The defendants agreed and the parties entered into an informal oral agreement for the sale whereby the defendants took over the operation of the plaintiff's practice on July 1, 1963. Approximately one year later, the parties attempted to reduce their agreement to writing. The basic terms of the agreement were contained in a proposal written on the back of a check. Thereafter, following further discussion and modification, the parties executed a two-page, handwritten agreement dated July 7, 1964.

The agreement is in two parts. Part one provides for certain lump sum payments for furniture and good will and is undisputed in this appeal. Part two, entitled "Sale of Practice," calls for payments to the plaintiff, based on financial results, over a five-year "buy-out" period from June 30, 1963, to June 30, 1968. The plaintiff was to be paid either (1) 15 percent of gross collections during the five-year contract period, or (2) 50 percent of the profit on accounts collected, whichever was less. It is undisputed that, in fact, the second alternative formula, under any interpretation, would yield the lower figure. Thus, the dispute between the parties centers on the calculation of "50 percent of profit on accounts collected" under the second formula.

The contract defined "profit" as gross collections, less staff payroll cost,[1] less $10 per hour for partners' time, less 30 percent of staff payroll cost as a charge for overhead. If actual overhead cost was less than 30 percent of staff payroll cost, the actual figure was to be used. Despite substantial agreement about the underlying raw data, the parties differ about the method of computation required as a matter of interpretation of several of the provisions of the contract.

At the outset, the defendants contend that the court's interpretation of the contract as a whole is unreasonable because it produces paper profits when in fact the business lost money. According to the defendants, the parties intended that the plaintiff would be paid only if the business proved profitable, and the formula set out in the contract for determining "profit" was intended merely to

[1] The hourly cost for staff payroll was to be computed as annual base salary divided by 1800 hours.

simplify computations, not to distort reality. The defendants have gone to elaborate lengths to attempt to prove that the plaintiff's business, under so-called "generally accepted accounting principles," experienced a net loss during the five-year buy-out period. Such calculations are, however, wholly irrelevant to the interpretation of the parties' agreement in this case.

It is the general rule that a contract is to be interpreted according to the intent expressed therein, and not by an intent the court may believe existed in the minds of the parties. *Robinson* v. *Weitz,* 171 Conn. 545, 551, 370 A.2d 1066 (1976). "The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." *White Oak Corporation* v. *State,* 170 Conn. 434, 439, 365 A.2d 1162 (1976). Had the parties wished to define profit according to generally accepted accounting principles, they could easily have done so. They chose instead a definition of profit as gross collections less certain stipulated deductions for partners' time, staff payroll, and overhead. Whether or not application of this definition produces a profit that would not have resulted under another definition, it is still the parties' agreement, rather than some alternate "real world" figure, that must control. The defendants "cannot now be heard to claim, for [their] own benefit, that the actual undertaking of the parties was other than that which appears in their written agreement." *Osborne* v. *Locke Steel Chain Co.,* 153 Conn. 527, 531, 218 A.2d 526 (1966).

The defendants next claim that the court erred in computing staff payroll cost for employees who worked more than 1800 hours in a year. The con-

tract provides for an employee's hourly rate to be computed by dividing his or her annual base salary by 1800 hours. The court, however, by accepting the plaintiff's calculations on all disputed issues, read an implied exception into this contract language for employees who actually worked more than 1800 hours. For those employees, the payroll cost chargeable to the plaintiff was limited to their actual salary, because if their actual hours worked had been multiplied by the hourly rate called for by the agreement, the plaintiff would have been charged for more payroll cost than was actually incurred. This approach, although logical, finds no support in the contract language. The contract provides a clear and unambiguous formula for the calculation of staff payroll cost; an implied exception cannot be read into the contract by the interpretation of the court. *Collins* v. *Sears, Roebuck & Co.,* 164 Conn. 369, 374, 321 A.2d 444 (1973); *Bria* v. *St. Joseph's Hospital,* 153 Conn. 626, 632, 220 A.2d 29 (1966). There was thus error in the calculation of staff payroll cost for employees working more than 1800 hours. It is undisputed that the difference between the parties' respective calculations of this amount, including 30 percent for overhead, is $2607 gross and $1304 net.

The composition of the "staff" for the purpose of staff payroll calculations constitutes the defendants' next claim of error. They challenge the court's finding that staff payroll includes accounting staff only, to the exclusion of clerical or "hybrid" employees, and contend that the payroll cost of one employee from the Bridgeport office and four from Westport, none of whom was an accountant,

should have been included in staff payroll cost.[2] Although the contract did not specifically outline who was to be included as "staff," the evidence printed in the plaintiff's appendix, including testimony from one of the defendants' witnesses, amply supports the court's finding that only accountants were to be included in the term.

The defendants have challenged the court's use of Bridgeport office payroll rates for work done on the plaintiff's accounts in the defendants' Westport office. It should be noted that in August, 1965, during the contract period, the plaintiff's original lease for the Bridgeport office expired and the entire business was moved to the defendants' Westport office, where it was nevertheless operated as a separate entity with separate books. The contract, by amendment, provided that work done by the defendants' *New York* office would be charged to the plaintiff at separate, higher rates. The defendants' contention that these higher rates should also be used for work done in Westport finds no basis in the contract language or elsewhere. The existence of the Westport office was known to all the parties at the time of the execution of the agreement, and they were free to establish separate rates for work done at that location. The court did not err in concluding that the parties did not intend the special New York office rates to apply to work done in Westport.

The defendants next point to four claimed numerical errors in the court's calculations. The first concerns the adjustment to the Bridgeport payroll cost for work on the defendants' accounts and the

---

[2] Under the defendants' interpretation, the overhead charge, set at 30 percent of staff payroll cost, would also, of course, be correspondingly higher.

second involves figures for the cost of work done by the New York office on the plaintiff's accounts. In each case the defendants assert that the plaintiff admitted that their figures were correct. We have examined the defendants' claim and conclude that the plaintiff in neither case admitted the accuracy of the defendants' figures. The third claimed numerical error, concerning the amount of gross collections for the five-year period, cannot be sustained in light of the unchallenged finding that gross collections (exclusive of after-collected receivables) totalled $164,343. The fourth claimed numerical error, however, has merit. The court recognized that 50 percent of Christmas bonuses paid to employees should be deducted from the amount due to the plaintiff and that the amount of such bonuses was $2236 gross and $1118 net. In calculating the actual deduction, however, the court mistook the $1118 figure for the gross amount and further reduced it by 50 percent to $559. The amount of the judgment was, therefore, overstated by this error by $559.

The defendants lastly claim error concerning the interpretation of the contract provision that, after the fifth year, at the end of the buy-out period, the plaintiff was to receive 15 percent of the June 1968 receivables collected after that date, and that no costs were to be applied to these receivables. The receivables thus collected totalled $20,210, an amount not now disputed. Of this amount, the court awarded the plaintiff 50 percent, rather than 15 percent, in apparent reliance on the 50 percent formula applied in the calculation of the plaintiff's compensation for moneys received during the five-year buy-out period. The defendants urge that the 50 percent figure is an inappropriate measure for

the entirely separate entitlement to collections subsequent to June, 1968, and we agree. The 50 percent figure applies to a different time frame, and by its terms is inapplicable to subsequently collected receivables, whereas the 15 percent figure is consistent with the exclusion of all costs. The plaintiff on this item should have received $3032, rather than $10,105, an overstatement of $7073.

In addition to the disputes concerning interpretation of the contract language, three other issues remain. The first concerns the propriety of interest on the judgment, and on this issue the court's finding has engendered some confusion. The judgment of the court provided for *no* interest. The memorandum of decision makes it clear that "[j]udgment may enter for the plaintiff to recover [$23,254] *without interest*." One of the court's findings of fact, however, provides that "[p]laintiff is entitled to interest on said sum from June 30, 1968." Yet one of the court's conclusions of law provides that "[n]o interest is due up to the date of judgment. The amount due the plaintiff was not wrongfully withheld by the defendants. It was by no means a liquidated amount and there was much doubt about it." Whatever may have engendered these inconsistencies, the terms of the judgment must control. Since the judgment did not provide for interest, and since the plaintiff did not appeal from the judgment, he cannot now rely on an inconsistent finding of fact to obtain that which was not originally awarded.

The defendants have assigned error to the court's denial of their motion for permission belatedly to amend their answer by filing a special defense and counterclaim. The proposed special defense alleged

that the contract failed of its essential purpose because of unforeseen circumstances, and the proposed counterclaim sought cancellation and rescission of the contract based on mutual mistake and the absence of a meeting of minds between the parties. The complaint in this case was brought in May, 1969, and hearings were begun in July, 1975. The defendants' motion to amend was not made until October, 1976, well after the start of trial. "The allowance of an amendment during the course of the trial lies in the sound discretion of the trial court. . . . This court will not interfere with the decision of a trial court not to permit an amendment unless an abuse of discretion is clearly evident." *DuBose* v. *Carabetta,* 161 Conn. 254, 263, 287 A.2d 357 (1971). See Practice Book, 1978, § 176; *Robinson* v. *Faulkner,* 163 Conn. 365, 376, 306 A.2d 857 (1972); *Corcoran* v. *Jacovino,* 161 Conn. 462, 471, 290 A.2d 225 (1971). The defendants in this case have set forth absolutely no evidence from which we could conclude that the court abused its discretion in disallowing the proffered amendment after the start of trial.

Finally, the defendants contend that the plaintiff's claim should be barred by laches because he made no effort to inspect the defendants' books until 1975, twelve years after they took over his business. In order to establish that the plaintiff is guilty of unreasonable delay, however, two elements must be proven: " 'First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant.' *Kurzatkowski* v. *Kurzatkowski,* 142 Conn. 680, 685, 116 A.2d 906." *Sarner* v. *Fox Hill, Inc.,* 151 Conn. 437, 444, 199 A.2d 6 (1964); *Paiva* v. *Vanech Heights Construction Co.,* 159 Conn. 512, 519, 271 A.2d 69 (1970).

There is no indication in the finding, nor have the defendants proffered any evidence, to show that they were in any way prejudiced by the plaintiff's failure to undertake an earlier inspection of the records of his former business. The complaint was timely brought within a year of the conclusion of the five-year buy-out period, no records had been destroyed or had otherwise become unavailable, and there is no evidence that any burden imposed on the defendants by the institution of this suit would in any way have been ameliorated had the plaintiff inspected the records sooner.

There is error in part; the judgment is to be modified in accordance with this opinion by reducing the plaintiff's recovery by the amount of $8936.

In this opinion the other judges concurred.