ROBERT A. LEVINE ET AL. *v.* JAMES V. MASSEY III ET AL.
(14989)

CALLAHAN, BORDEN, BERDON, NORCOTT and PALMER, Js.

Argued November 3, 1994—decision released February 21, 1995

*John M. Calimafde,* pro hac vice, with whom, on the brief, were *Lori Welch-Rubin* and *Roger Sullivan,* for the appellants-appellees (plaintiffs).

*Thomas E. Minogue, Jr.*, with whom were *Alexander W. Samor* and *Barry Kramer*, for the appellee-appellant (named defendant).

CALLAHAN, J. The plaintiffs, Robert A. Levine and Stephen C. Wardlaw, both medical doctors, and the named defendant, James V. Massey III (defendant), the owner and operator of a medical laboratory, collaborated to invent a device utilizing a capillary tube and an interior float that, upon centrifugation, separated a blood sample placed in the tube into constituent parts in discernible measurable layers (capillary tube-float device). This unique device was of substantial value to the medical profession because it permitted quick blood analysis. In 1976, Levine, Wardlaw and Massey jointly applied for and subsequently obtained a United States patent on the device. Thereafter, three additional patents were issued jointly to the inventors, all relating to the separation of blood by centrifugation into constituent parts by use of a capillary tube and float.

Wardlaw, alone, also invented what the parties have described as a "manual reader," an instrument used for viewing and measuring the thickness of each separated layer of blood constituents in the capillary tube-float device. A separate patent application for the manual reader was filed in 1977 and a patent was issued to Wardlaw in 1979, individually, as the inventor of that device. Wardlaw assigned equal shares in the manual reader patent to Levine and Massey. It is undisputed that Wardlaw had conceived of and worked on the manual reader prior to the time that the capillary tube-float device for separating blood into its constituent parts was patented or licensed.

On April 1, 1977, Levine, Wardlaw and Massey entered into a licensing agreement with the defendant Becton, Dickinson and Company (Becton, Dickinson), a manufacturer and distributor of medical equipment,

which is not a party to this appeal. In exchange for royalties, this agreement gave Becton, Dickinson the exclusive right to manufacture, use and sell, worldwide, the capillary tube-float device and any related technology or improvements to that device invented by any of the licensors. The parties conceded, and it is obvious from the Becton, Dickinson agreement, that the manual reader, invented solely by Wardlaw but jointly owned by Wardlaw, Levine and Massey, was part of the technology related to the capillary tube-float device originally licensed to Becton, Dickinson.

As a method of payment of royalties, the agreement between Levine, Wardlaw and Massey and Becton, Dickinson provided: "A check for one third of the royalty or other payment due licensors shall be made payable to each licensor and sent to the addresses set out herein in the introductory paragraph. The licensors agree that this method of payment shall discharge licensee's obligation to each of the licensor's with respect to such payment." In the years since the agreement was executed, Becton, Dickinson has paid substantial royalties to each of the three licensors in this fashion.

On April 1, 1977, the same day that Levine, Wardlaw and Massey entered into the agreement with Becton, Dickinson, they executed a separate agreement defining their obligations to each other in relation to their invention and the licensing agreement with Becton, Dickinson. The purpose of the agreement, in part, was to distinguish between such future improvements on the basic invention or new inventions in which the parties would share equally, and those that would remain solely the property of the individual inventor.

At some time in 1982, the defendant ceased working with the plaintiffs. Thereafter, Wardlaw invented and subsequently obtained patents in 1985 and 1987 for an instrument called the "auto reader." The auto

reader was described in Wardlaw's patent applications as relating to "an improved method and apparatus for measuring substantially accurate blood constituent counts in a centrifuged sample of anticoagulated whole blood." Wardlaw assigned a joint interest in the auto reader invention to Levine, with whom he was still affiliated.

Pursuant to its April 1, 1977 agreement with the parties, Becton, Dickinson acquired the rights to, and has manufactured, sold and distributed, the auto reader device. Pursuant to the terms of its April 1, 1977 agreement with the parties, it also has paid one third of the royalties due on its sales of the auto reader, as well as royalties due on the capillary tube-float device and the manual reader, to Levine, Wardlaw and Massey each. A controversy arose, however, as to whether Massey was entitled to royalties from sales of the auto reader. The royalties paid by Becton, Dickinson to each party attributable to the auto reader are in excess of $500,000.

After unsuccessful attempts to resolve the issue of entitlement to the royalties from the auto reader, the plaintiffs commenced this action against the defendant. In their complaint, the plaintiffs alleged that royalties from the auto reader did not fall within the royalty sharing agreement among themselves and Massey, and that the auto reader's claims were not dominated[1] by any claims of the capillary tube-float device. They claimed, therefore, that Massey was not entitled to

[1] "Domination" refers to "that phenomenon, which grows out of the fact that patents have claims, whereunder one patent has a broad or 'generic' claim which 'reads on' an invention defined by a narrower or more specific claim in another patent, the former 'dominating' the latter because the more narrowly claimed invention cannot be practiced without infringing the broader claim. . . . In possibly simpler terms, one patent dominates another if a claim of the first patent reads on a device built or process practiced according to the second patent disclosure." *In re Kaplan*, 789 F.2d 1574, 1577 (Fed. Cir. 1986).

receive any royalties from the auto reader. In their prayer for relief, the plaintiffs claimed an accounting from Massey for any royalties received, damages, interest and costs, as well as an order determining the allocation of future royalty payments between the parties.[2] The defendant denied the plaintiffs' allegations.[3]

The defendant argued in the trial court that because the manual reader was contemplated by Wardlaw prior to 1977, and had been invented by him at the time of the agreement with Becton, Dickinson in 1977, and was actually a part of the technology that was originally licensed to Becton, Dickinson, it was a part of the basic invention referred to in the April 1, 1977 agreement among the parties. The defendant argued, moreover, that the claims of the manual reader patent dominated those of the auto reader patent and that he, therefore, was entitled, pursuant to the agreement of the parties, to royalties from the auto reader.

The trial court found that the manual reader was part of the basic invention as contemplated by the agreement among the plaintiffs and the defendant. The court then determined that the auto reader was an improvement on the manual reader and that its patent claims were dominated by those of the manual reader. It concluded that, pursuant to the April 1, 1977 agreement among the parties, the defendant was entitled to one third of the royalties from sales of the auto reader for the life of the manual reader patent.[4] Additionally, the

[2] The plaintiffs' complaint also contained an interpleader count requesting that Becton, Dickinson be required to make any royalty payments to the court. The trial court denied the interpleader, and the plaintiffs have not appealed from that denial.

[3] The defendant also filed three special defenses and a three count counterclaim in answer to the plaintiffs' complaint. The counterclaim was subsequently withdrawn. The special defenses were found to be without merit by the trial court.

[4] Responding to the defendant's motion, the trial court rendered an articulation of its original judgment. The articulation, however, is self-

trial court found that since there appeared to be no disagreement between the parties concerning the amount of royalties that had been paid, what they had been paid for, and to whom, there was no need for an accounting.

The plaintiffs appealed, and the defendant cross appealed,[5] from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

We agree with the trial court that the principal issue raised by this appeal is one of contract law and not one of patent law. It is not necessary, therefore, for us to determine whether the patent claims of the manual reader dominate[6] those of the auto reader. We conclude, rather, that the manual reader was not a part of the basic invention that was the subject of the April 1, 1977 agreement among the parties. Therefore, improvements to the manual reader, in the form of the auto reader, were not "vested in the parties in equal undivided shares or interest" as provided by their agreement.

Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact; *Gurliacci* v. *Mayer*, 218 Conn. 531, 567, 590 A.2d 914 (1991); *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199, 520 A.2d 208 (1987); "[w]here there is definitive contract language, the

contradictory. Therefore, we assume that the court's original memorandum of decision expresses the reasoning for the trial court's judgment. In addition, the articulation is not directly relevant to our determination of the plaintiffs' claims.

[5] On his cross appeal, the defendant raised the issue of whether the trial court properly found that the defendant was entitled to royalties from sales of the auto reader only for the life of the manual reader patent. Because we reverse the judgment of the trial court, we need not address this issue.

[6] See footnote 1.

determination of what the parties intended by their contractual commitments is a question of law. *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, 203 Conn. 123, 131, 523 A.2d 1266 (1987)." (Internal quotation marks omitted.) *Mulligan* v. *Rioux*, 229 Conn. 716, 740, 643 A.2d 1226 (1994). We regard this case to present such definitive contract language.[7]

It is the general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties. Id.; *Barnard* v. *Barnard*, 214 Conn. 99, 110, 570 A.2d 690 (1990); *Powel* v. *Burke*, 178 Conn. 384, 387, 423 A.2d 97 (1979). When the intention conveyed by the terms of an agreement is "clear and unambiguous, there is no room for construction." *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 138, 475 A.2d 305 (1984). "[A] court cannot import into [an] agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms." *Hatcho Corp.* v. *Della Pietra*, 195 Conn. 18, 21, 485 A.2d 1285 (1985); see also *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 159, 595 A.2d 872 (1991)

---

[7] The dissent cites *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 623 A.2d 995 (1993), for the proposition that this court has rejected the "four corners" doctrine of contract interpretation. *Sims*, however, was a narrow exception to the general rule of contract construction. "We recognize that our conclusion is a departure from the general rule of contract construction that unambiguous contract provisions are to be given their plain meaning without reference to evidence outside the four corners of the agreement. . . . Rigid application of that general rule would, however, frustrate the purposes of [General Statutes] § 52-572e, which counsels against uncritical enforcement of boilerplate general release language and, therefore, justifies treating such language differently from how we treat other contractual provisions. Accordingly, we hold that, in light of the purposes of § 52-572e, general releases like that executed by Sims are not subject to that traditional rule of contract construction." (Citations omitted.) Id., 415. Because the present case does not frustrate the purpose of a remedial statute, we see no justification for treating it differently than other contractual provisions with definitive language.

(" '[i]t is not within the power of courts to create new and different agreements' "); *Jay Realty, Inc.* v. *Ahearn Development Corp.*, 189 Conn. 52, 55, 453 A.2d 771 (1983) (same); *Cirrito* v. *Turner Construction Co.*, 189 Conn. 701, 706–707, 458 A.2d 678 (1983) ("[i]n interpreting a contract courts cannot add new or different terms"); *Powel* v. *Burke,* supra, 388.

"The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. *Downs* v. *National Casualty Co.*, 146 Conn. 490, 494, 152 A.2d 316 [1959]. The circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used. *Connecticut Co.* v. *Division 425,* 147 Conn. 608, 616–17, 164 A.2d 413 [1960] . . . . It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties." (Citations omitted.) *Zullo* v. *Smith,* 179 Conn. 596, 601, 427 A.2d 409 (1980); see *Sturman* v. *Socha,* 191 Conn. 1, 12, 463 A.2d 527 (1983). "Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Reese* v. *First Connecticut Small Business Investment Co.*, 182 Conn. 326, 327, 438 A.2d 99 (1980).

The plaintiffs make no claim that, under the licensing agreement with Becton, Dickinson, the defendant is not entitled to one third of the royalties due from Becton, Dickinson that are related to the capillary tube-float device or the manual reader. They do claim, however, that pursuant to the April 1, 1977 agreement among the parties, the defendant was not, and is not, entitled to any royalties attributable to the auto reader. We agree.

In their April 1, 1977 agreement, the plaintiffs and the defendant acknowledged that they "have *jointly*

invented a method and apparatus for the measurement of blood counts and other similar tests for which they have made applications for United States Letters Patent, Serial No. 673,058, filed April 2, 1976, and indicated as being allowable on December 17, 1976, and desire to define their rights and interests in *said* invention and in any Letters Patent which they or any of them may obtain relating to *the* invention . . . ." (Emphasis added.)

The agreement also stated that: the parties shall endeavor, through their attorney, to obtain "Letters Patent of the United States for *said* invention"; costs "in connection with the development of *the* invention" be shared; any "payments derived by the parties from *the* invention or Letters Patent shall be divided equally among them"; "[n]one of the parties shall sell, assign or mortgage his share or interest in *the* invention . . . or grant any license thereunder without the previous written consent of the others"; and if any party "shall make or acquire any improvement or apply for or obtain any patent for any improvement upon *said* invention, he shall forthwith disclose the same to the others . . . to the end that the same shall be vested in the parties in equal undivided shares or interest . . . ." (Emphasis added.)

It is clear, from the opening substantive paragraph of the April 1, 1977 agreement among the parties,[8] as well as the entire text of the agreement, that the only "invention"—whether termed "the invention," "said invention" or "the basic invention"—covered by this

---

[8] "WHEREAS, the parties have jointly invented a method and apparatus for the measurement of blood counts and other similar tests for which they have made applications for United States Letters Patent, Serial No. 673,058, filed April 2, 1976, and indicated as being allowable on December 17, 1976, and desire to define their rights and interests in said invention and in any Letters Patent which they or any of them may obtain relating to the invention . . . ."

agreement was the capillary tube-float device, and not the manual reader. The only invention mentioned in the April 1, 1977 agreement among the parties is the invention described as having been "jointly invented," which was identified by its patent application serial number of 673,058, and the application as having been filed on April 2, 1976. The only invention to which those particulars apply is the jointly invented capillary tube-float device. The manual reader upon which the defendant grounds his claim for auto reader royalties was not "jointly invented," but, rather, was invented by Wardlaw alone. Moreover, its patent application bears a different number and filing date than that filed for the capillary tube-float device.

The agreement further provided that "improvements made by and Letters Patent issuing therefrom which relate to the use of capillary tubes, but which are not dominated by any claims contained in any of the patent applications or Letters Patent of the *basic invention*, shall not be subject to equal shares among the parties. Any such improvements and Letters Patent not dominated by the claims of the *basic invention* shall remain the property of the inventor. *In the event that such improvements of Letters Patent, because of the language of the aforesaid license agreement with Becton, Dickinson, become subject to its royalty provisions, then any such royalties paid by Becton, Dickinson to parties other than the inventor shall be paid over by such parties to the inventor. The calculations for such payment will be made to the end that the inventor shall be made whole as though he had licensed his improvement or Letters Patent individually to Becton, Dickinson and Company.*" (Emphasis added.)

This paragraph of the April 1, 1977 agreement among the parties made their intentions clear: any future inventions that are related to the use of capillary tubes, but which are not dominated by the claims contained

in the patents *for the capillary tube-float device*, remain the sole property of the inventor of that invention; and, the terms of the payment of royalties contained in the licensing agreement with Becton, Dickinson notwithstanding, the royalties for that invention—in this case, the auto reader—must be paid over to the inventor—in this case, Wardlaw, and, by virtue of their separate arrangement, Levine—just as though the inventor had licensed his invention individually to Becton, Dickinson.

In other words, as applied to the facts of this case, Wardlaw and Levine, and not Massey, would be entitled to the royalties on the auto reader *unless* the claims of the *capillary tube-float device*—not the claims of the manual reader, as suggested by the defendant—dominate the claims of the auto reader. Furthermore, as the plaintiffs correctly point out, the only evidence in this case in this regard was that the claims of the capillary tube-float device did not dominate the claims of the auto reader, and there was no contrary evidence. Therefore, under the clear language of the agreement as applied to the facts of this case, the royalties generated by the auto reader belong to the plaintiffs, and the defendant has no right to them.

Consequently, we conclude that the April 1, 1977 agreement among the parties was unambiguous. It describes with exactness the invention, the improvements to which the parties had a duty to disclose and which improvements would be jointly owned. That invention was the capillary tube-float device. The fact that there is a reference in the parties' agreement to the "basic invention" without describing or referring to any invention other than the capillary tube-float device, while describing that device in detail, does not render the agreement ambiguous. "[W]ords do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) *Water & Way Properties* v. *Colt's Mfg.*

*Co.*, 230 Conn. 660, 668, 646 A.2d 143 (1994); *Downs* v. *National Casualty Co.*, supra, 146 Conn. 494–95. The agreement does not even mention the manual reader, let alone describe it with any degree of particularity. If we were to interpret the agreement to include the manual reader so as to require joint ownership of improvements dominated by patent claims to that device, we would be rewriting the agreement of the parties. That we cannot do.[9] *Bank of Boston Connecticut* v. *Schlesinger*, supra, 220 Conn. 159; *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 374, 321 A.2d 444 (1973).

Because the April 1, 1977 agreement of the parties specifically included only the jointly invented capillary tube-float device, the trial court improperly found that the manual reader was part of the basic invention encompassed by the agreement of the parties. Therefore, the trial court improperly concluded that the defendant was entitled to royalties from the auto reader.

The judgment is reversed, and the case is remanded with direction to render judgment for the plaintiffs on the first count of the complaint, and for appropriate orders on the plaintiffs' specific prayers for relief.

[9] In purporting to determine the intent of the parties in light of the surrounding circumstances, the dissent ignores the very language employed by the parties to express their intent—the words of the contract. Not only would the dissent's interpretation alter the meaning of some of the contract phrases (e.g., "jointly invented" apparently would mean "invented by Wardlaw and then assigned to Levine and Massey"), but the very purpose for entering into the agreement would be abrogated. The purpose of the agreement obviously was to ensure that if one of the parties invented a device "which relate[s] to the *use* of capillary tubes" (emphasis added), he would not be obligated to share the proceeds reaped from that device unless the claims contained in its patent were dominated by the claims contained in the patent of the capillary tube-float device. The auto reader patent was not dominated by the claims contained in the capillary tube-float device. In an attempt to ascertain the intent of the parties, the dissent concludes that the parties' intent was to enter into a meaningless agreement.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

BERDON, J., dissenting. The majority holds that, on appeal, the dispositive issue is whether the plaintiffs, Robert A. Levine and Stephen C. Wardlaw, and the named defendant, James V. Massey III, intended that "the invention"[1] referred to in their April 1, 1977 agreement (L/W/M agreement)[2] pertained only to the

---

[1] The contract also referred intermittently to "the invention" as "the basic invention." Neither party contends that "the basic invention" means something different than "the invention."

[2] The L/W/M agreement read as follows:

"AGREEMENT

"This agreement entered into this 1st day of April, 1977, by and between Stephen C. Wardlaw, residing at 16 Pine Orchard Road, Branford, Conn., Robert A. Levine, residing at 31 Pilgrim Lane, Guilford, Conn., and James V. Massey III, residing at 80 Driftwood Lane, Trumbull, Conn.

"WHEREAS, the parties have jointly invented a method and apparatus for the measurement of blood counts and other similar tests for which they have made applications for United States Letters Patent, Serial No. 673,058, filed April 2, 1976, and indicated as being allowable on December 17, 1976, and desire to define their rights and interests in said invention and in any Letters Patent which they or any of them may obtain relating to the invention; and

"WHEREAS, the parties have entered into a license agreement with Becton, Dickinson and Company, dated effective as of April 1, 1977.

"NOW, THEREFORE, the parties agree as follows:

"1. Application and Joint Ownership. The parties shall apply through their patent attorney for and endeavor to obtain in their joint names Letters Patent of the United States for said invention, and any Letters Patent obtained therefrom shall be held by them in equal shares as tenants in common.

"2. Costs and Profits to be Shared. All fees, charges and expenses incurred in connection with the development of the invention and obtaining, maintaining, and protecting the said Letters Patent shall be borne and paid by the parties in equal shares; and all profits, royalties or other payments derived by the parties from the invention or Letters Patent shall be divided equally among them.

"3. Restrictions on Transfer. None of the parties shall sell, assign, or mortgage his share or interest in the invention or said Letters Patent or grant any license thereunder without the previous written consent of the others.

capillary tube-float device. The trial court, however, concluded that it was the intention of the parties that "the invention" referred to the capillary tube-float device *and* the manual reader. The trial court wrote: "It appears to the court that when all is said and done it was the intention of the parties to share the profits on those inventions which were known to the parties at the time of entering the agreement on April 1, 1977, and to likewise share improvements which were dominated by the known inventions."[3]

"4. Improvements. If any of the parties at any time shall make or acquire any improvement or apply for or obtain any patent for any improvement upon said invention, he shall forthwith disclose the same to the others, and shall execute and do all applications, documents, instruments, and other things necessary for obtaining Letters Patent for and assigning the same, as the case may require, to the end that the same shall be vested in the parties in equal undivided shares or interest, and the same shall be held by the parties upon the same terms and conditions as the Letters Patent to be applied for under Paragraph 1 hereof.

"However, improvements made by and Letters Patent issuing therefrom which relate to the use of capillary tubes, but which are not dominated by any claims contained in any of the patent applications or Letters Patent of the basic invention, shall not be subject to equal shares among the parties. Any such improvements and Letters Patent not dominated by the claims of the basic invention shall remain the property of the inventor. In the event that such improvements of Letters Patent, because of the language of the aforesaid license agreement with Becton, Dickinson, become subject to its royalty provisions, then any such royalties paid by Becton, Dickinson to parties other than the inventor shall be paid over by such parties to the inventor. The calculations for such payment will be made to the end that the inventor shall be made whole as though he had licensed his improvement or Letters Patent individually to Becton, Dickinson and Company.

"IN WITNESS WHEREOF, we caused our signatures and seals to be affixed hereto.

[Signatures of Stephen C. Wardlaw, Robert A. Levine and James V. Massey III]"

[3] The trial court noted that "[i]t is conceded that the defendant Massey has a one-third interest in the Manual Reader patent." After reciting detailed testimony, the trial court concluded: "In short the combination of Dr. Wardlaw's diary of the invention process and Dr. Levine's testimony appears to make it clear that sometime in 1976, clearly prior to the parties' agreement in 1977, the Manual Reader in the form that was introduced at trial

Despite the fact that the parties do not dispute the factual findings of the trial court, and despite the fact that these findings clearly support the conclusion of the trial court, the majority nevertheless has decided to reverse the trial court on what it claims to be a matter of law. The majority justifies its action by concluding that the L/W/M agreement unambiguously does not include the manual reader as part of the invention and, therefore, that the actual intent of the parties is irrelevant. In other words, the majority has looked only to the "four corners" of the document, and has refused to consider extrinsic evidence bearing on the true intent of the parties.

The majority's analysis, however, is flawed for two reasons. First, the "four corners" doctrine is not the law of this state today, nor should it be. The trial court, therefore, was justified in considering extrinsic evidence in determining the meaning of the contract between the parties. Second, even if the majority is correct in asserting that "a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties," this rule cannot apply when the contract itself is imbued with ambiguity. Because several portions of the L/W/M agreement are ambiguous, the court was required to utilize extrinsic evidence to elicit the true meaning of the agreement.

I

While it is true that under the "four corners" doctrine, a court may not consider any extrinsic evidence unless a contract is ambiguous, the more modern view, propounded by Professors Corbin and Farnsworth,

was well along in the invention process. Because the Manual Reader appears to have existed as a clear concept, it is the holding of the court that it is within the contemplation of the parties when they talk about 'the invention' in the agreement between the parties to share profits."

recognizes that "the meaning of language may vary greatly according to the circumstances" and that "all language is infected with ambiguity and vagueness and that even language that seems on its face to have only one possible meaning may take on a different meaning when all the circumstances are disclosed . . . ." 2 E. Farnsworth, Contracts (1990) § 7.12, pp. 277–78. Under this theory, extrinsic evidence is always available to be used for interpreting the intent of the parties. Id., p. 272. After all, as Professor Corbin observed, "[n]o contract should ever be interpreted and enforced with a meaning that neither party gave it." 3 A. Corbin, Contracts (Sup. 1994) § 572B, p. 443; see 2 Restatement (Second), Contracts § 212, comment (b), and § 209, comment (a) (1981); see also Uniform Commercial Code, General Statutes § 42a-2-202.

Indeed, in *Sims* v. *Honda Motor Co.*, 225 Conn. 401, 623 A.2d 995 (1993), we rejected the "four corners" doctrine in interpreting a general release agreement, choosing instead to embrace the modern approach and to make it crystal clear that evidence is admissible to determine the actual intent of the parties. In *Sims*, the injured plaintiff had signed the contract with the intent of releasing only one defendant from liability, but the contract expressly discharged from liability "any and all" other parties from "any and all" claims arising from the incident. Id., 404. Chief Justice Peters, writing for the court, declined to enforce the plain meaning of the all encompassing release, and instead adopted a Corbin-like approach which "provides for consideration of extrinsic evidence of the parties' actual intent and does not confine interpretation of the release to its four corners." Id., 413.

Indeed, it is well established that the meaning of the language itself can be ascertained and interpreted only in light of the situation of the parties and the circumstances surrounding them. *Buckley* v. *Buckley*, 144

Conn. 403, 409, 133 A.2d 604 (1957); *United Aircraft Corp.* v. *O'Connor*, 141 Conn. 530, 538, 107 A.2d 398 (1954). Therefore, evidence that sheds light on the intent of the parties is admissible to construe the contract itself.

The Restatement (Second) of Contracts, § 212, comment (b), explained this concept as follows: "It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule [making extrinsic evidence of intent admissible] is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. . . . But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention."

The undisputed evidence on the record pertaining to the circumstances surrounding the execution of the L/W/M agreement and the conduct of the parties clearly supports the trial court's finding that "the invention" included the manual reader. Indeed, the record is abundant with evidence that the parties, both before and after executing the L/W/M agreement, clearly intended that the manual reader was part of the invention they were trying to market.

On February 26, 1977, a little more than one month before they entered into the L/W/M agreement, the parties met with a potential licensee to display their invention. They demonstrated the manual reader as part of the invention and led the licensee to believe that

the invention was "a complete system," including the capillary tube-float device and a manual reader. Just over one month later, the parties entered into the licensing agreement with Becton, Dickinson and Company. In this agreement, the parties again referred to an "invention." The plaintiffs conceded in their brief to the trial court that this use of the word "invention" referred *both* to the capillary tube-float device and to the manual reader.

Even more indicative of the intent of the parties than the circumstances surrounding the execution of the L/W/M agreement, however, is their subsequent conduct. Since signing the agreement in 1977, all of the parties have conducted themselves in a manner indicating that they intended "the invention" to include *both* the capillary tube-float device *and* the manual reader.

On April 20, 1977, nineteen days after they executed the L/W/M agreement, the parties issued a check from their partnership account to pay their patent attorney for processing the patent application for the manual reader. Wardlaw, in whose name the patent for the manual reader was initially registered, voluntarily assigned one-third interests in the manual reader patent to Levine and Massey. Since 1977, the parties have shared equally in the royalties of the manual reader and there is no evidence that Levine or Wardlaw ever contested Massey's share of the royalties that Massey received under their agreement with the eventual licensee, Becton, Dickinson and Company. Later, in a "proposal for the development" of the auto reader, Wardlaw admitted that Massey was "one of the participants in the development of the original [capillary tube-float device] and *reader* . . . ." (Emphasis added.)

Finally, the three inventors shared in the royalties on the auto reader for more than one year before the

plaintiffs brought this action. During this time, Massey was paid approximately $500,000 in royalties on the auto reader by Becton, Dickinson and Company. Indeed, Wardlaw and Levine brought this action only after Massey refused Levine's request to modify the L/W/M agreement in order to cut off Massey's rights to the royalties in the auto reader commencing in 1996.

We have repeatedly held that "[i]n construing the intended meaning of terms in a contract, the conduct of the parties regarding their use is a proper consideration." *Lar-Rob Bus Corp.* v. *Fairfield*, 170 Conn. 397, 407–408, 365 A.2d 1086 (1976). Indeed, their conduct "is given *great weight* in the interpretation of the agreement." (Emphasis added.) 2 Restatement (Second), Contracts § 202 (4) (1981). This is so because "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." Id., § 202, comment (g). In this case, the conduct of the parties strongly supports the trial court's finding that the L/W/M agreement's reference to "the invention" included *both* the capillary tube-float device *and* the manual reader.

Three years ago, in the case of *Voll* v. *Lafayette Bank & Trust Co.*, 223 Conn. 419, 613 A.2d 266 (1992), this court succinctly summarized both the role of the trial court in interpreting contracts and the standard of review we employ in reviewing the trial court's findings in this regard. Justice Callahan, writing for the court, wrote that "[a] contract is to be construed according to what may be assumed to have been the understanding and intention of the parties. *Ginsberg* v. *Mascia*, 149 Conn. 502, 505–506, 182 A.2d 4 (1962). The intention of the parties is a question of fact to be determined from the language of the contract, the circumstances attending its negotiation, and the conduct of the parties in relation thereto. *Kakalik* v. *Bernardo*, 184 Conn. 386, 393, 439 A.2d 1016 (1981). The trial

court's finding of fact with respect to intent is reversible on appeal only if the court's finding was clearly erroneous. *A. Dubreuil & Sons, Inc.* v. *Lisbon,* 215 Conn. 604, 609–10, 577 A.2d 709 (1990); *Kakalik* v. *Bernardo,* supra [393]." (Internal quotation marks omitted.) *Voll* v. *Lafayette Bank & Trust Co.,* supra, 426.[4] That, of course, is not the case here. The evidence conclusively supports the trial court's factual determination that the parties intended that the term "the invention" in the L/W/M agreement include the manual reader. This court, therefore, should affirm the judgment of the trial court.[5]

## II

Even if the majority is correct that the meaning of the contract must be determined from the "four corners" of the agreement, however, no one claims that this rule has any application when the contract itself

[4] Moreover, "the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact. As an inference of fact, it is not reversible unless the trial court could not reasonably have arrived at the conclusion that it reached. *Otto Contracting Co.* v. *S. Schinella & Sons, Inc.,* 179 Conn. 704, 709, 427 A.2d 856 (1980); *Hydro-Hercules Corporation* v. *Gary Excavating, Inc.,* 166 Conn. 647, 653, 353 A.2d 714 (1974); *Bianco* v. *Darien,* 157 Conn. 548, 557, 254 A.2d 898 (1969); *Finlay* v. *Swirsky,* 98 Conn. 666, 671, 120 A. 561 (1923)." *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981).

[5] The majority contends that, according to this interpretation of the L/W/M agreement, "the very purpose for entering into the agreement would be abrogated" and the document would become a "meaningless agreement." See footnote 9 of the majority opinion. These are incorrect statements. The contract sets forth the rights of the parties with respect to the capillary tube-float device and the manual reader, and it governs the rights of the parties in the event that one of them invents an improvement on those devices "which relate[s] to the use of capillary tubes." In such a case, if none of the patent claims of the capillary tube-float device and none of the patent claims of the manual reader dominate any of the patent claims of the improvement, then the inventor of that improvement need not share credit with the other parties. For all other improvements, however, the contract provides that the inventor must share credit with the other parties. The contract, therefore, performs a valid function.

is ambiguous. See, e.g., *TIE Communications, Inc.* v. *Kopp*, 218 Conn. 281, 288–89, 589 A.2d 329 (1991); *Cody* v. *Remington Electric Shavers*, 179 Conn. 494, 500, 427 A.2d 810 (1980). Although the majority reads the L/W/M agreement as a model of clarity, I find it to be patently ambiguous as to the meaning of the word "invention," thereby requiring the court to consider extrinsic evidence bearing on the intention of the parties.

The first contract recital provides, in part, that "WHEREAS, the parties have jointly invented a method and apparatus for the measurement of blood counts and other similar tests for which they have made applications for United States Letters Patent, Serial No. 673,058, filed April 2, 1976, and indicated as being allowable on December 17, 1976, and desire to define their rights and interests in said invention and in any Letters Patent which they or any of them may obtain relating to the invention . . . ." The majority uses the wording of this recital to conclude that "[t]he only invention to which those particulars apply is the jointly invented capillary tube-float device."

If this reading of the contract is correct, however, then the first operative paragraph of the agreement is wholly without purpose. That paragraph provides that "[t]he parties *shall apply* through their patent attorney for and *endeavor to obtain* in their joint names Letters Patent of the United States *for said invention,* and any Letters Patent obtained therefrom shall be held by them in equal shares as tenants in common." (Emphasis added.) At the time the parties entered into this agreement, however, they *already* had applied for and endeavored to obtain patents for the capillary tube-float device. In fact, they had filed the patent application, Serial No. 673,058, with the United States Patent Office on April 2, 1976, one full year earlier. The Patent Office had ruled on December 17, 1976, four

months before the parties executed the contract, that the application for the patent was allowable. Yet this paragraph of the L/W/M agreement clearly contemplated a patent which the parties would apply for and seek *in the future* and which would be included in the contract term "invention." Obviously, the "plain language" of the agreement is not so plain, and the term "invention" refers to more than simply the capillary tube-float device. The exact meaning of "invention," therefore, can be ascertained only by reference to extrinsic evidence.

Furthermore, the recital to the contract quoted above is rife with other ambiguities. First, the reference to "the *measurement* of blood counts and other similar tests" (emphasis added) connotes equipment that includes the manual reader, the very purpose of which is to measure blood counts.

Second, the contract refers to "*applications* for United States Letters Patent," but goes on to list only one serial number for these patent applications. (Emphasis added.) As indicated above, one week after signing this agreement, the parties paid their attorney for processing a patent application for the manual reader, and the patent was awarded shortly thereafter. Indeed, as the defendant explained in his posttrial brief to the trial court, "[t]he only reason that the [manual] reader instrument was not listed by serial number in the [L/W/M agreement] . . . was because the patent application for the reader had not been assigned a serial number by that date." The reference to "*applications*," therefore, can be construed as meaning the patent for the manual reader. (Emphasis added.)

Third, the parties refer specifically to future patents, which also can be construed as relating to the patent application for the manual reader.

Finally, the contract as a whole, including the description of the measurement of blood counts, clearly contemplates the application for additional patents and the making of additional improvements, all of which make ambiguous the meaning of the term "invention." Even if the "four corners" rule applies, therefore, these ambiguities should prevent this court from attempting to discern the meaning of the contract without referring to extrinsic evidence to ascertain the intent of the parties.

Accordingly, it is clear that, pursuant to the L/W/M agreement,[6] the named defendant is entitled to a one-third share of the royalties on the auto reader. Therefore, I respectfully dissent.

---

[6] The trial court found that the manual reader patents, in the parlance of patent law, "dominated" those of the auto reader. "By domination we refer, in accordance with established patent law terminology, to that phenomenon, which grows out of the fact that patents have claims, whereunder one patent has a broad or 'generic' claim which 'reads on' an invention defined by a narrower or more specific claim in another patent, the former 'dominating' the latter because the more narrowly claimed invention cannot be practiced without infringing the broader claim. To use the words of which the board seemed to be enamored, the broader claim 'embraces' or 'encompasses' the subject matter defined by the narrower claim. In possibly simpler terms, one patent dominates another if a claim of the first patent reads on a device built or process practiced according to the second patent disclosure." *In re Kaplan*, 789 F.2d 1574, 1577 (Fed. Cir. 1986). The agreement clearly provided that if either Levine, Wardlaw or Massey made or acquired any improvement on the invention, and that improvement was dominated by the invention, then the remaining inventors would share equally in those royalties for the improvement.