

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-1996

# Sterling Natl Mtg Co v. Mtg Corner Inc

Precedential or Non-Precedential:

Docket 96-5007

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Sterling Natl Mtg Co v. Mtg Corner Inc" (1996). *1996 Decisions.* Paper 34.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/34

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 96-5007
_____


STERLING NATIONAL MORTGAGE CO., INC.,
A Corporation of the State of New Jersey,

Appellant

v.

MORTGAGE CORNER, INC.,
A Corporation of the State of Connecticut;
CENTERBANK MORTGAGE COMPANY,
A Corporation of the State of Connecticut

_____


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 93-03266)
_____


Argued:  June 6, 1996

     Before:  BECKER, MANSMANN, Circuit Judges, and
SCHWARZER, District Judge.


(Filed October 1, 1996)

JOEL N. KREIZMAN, ESQUIRE (ARGUED)
Evans, Osborne, Kreizman and Bonney
180 White Road, Suite B 101
Little Silver, NJ  07739

Attorneys for Appellant

SIGRID S. FRANZBLAU, ESQUIRE (ARGUED)
Riker, Danzig, Schered, Hyland & Perretti
One Speedwell Avenue
Morristown, NJ  07962-1981

Attorneys for Appellees

_____


OPINION OF THE COURT
_____

BECKER, Circuit Judge.

This is an appeal from an order of the district court in a diversity case granting summary judgment for the defendants on plaintiff's state law claims of breach of contract and tortious interference with a prospective economic relationship. We affirm with respect to the tortious interference claim, but reverse with respect to the contract claims, and remand for further proceedings.

I.

Defendant The Mortgage Corner ("TMC") runs a multilender mortgage loan network. Lenders on TMC's network regularly fax their current mortgage rates, terms, and conditions to TMC financial service representatives ("FSRs") stationed in various local real estate offices. The FSRs then present these rates and terms to potential homebuyers. In this manner, lenders compete for business, and consumers have a choice of mortgage rates and terms. For its part, TMC receives a percentage of each loan that closes as a result of its referral.

On July 23, 1992, Sterling National Mortgage Company ("Sterling") entered into an agreement with TMC pursuant to which it became a lender on the TMC network. Under this agreement, TMC "may submit completed Mortgage Loan Applications to [Sterling] from time to time." (J.A. at 18.) Sterling, in turn, had a duty to "process, accept, issue mortgage loan commitments for, fund and close, in a timely manner," the applications submitted by TMC. (J.A. at 18.) For each completed loan, Sterling would pay TMC .625 basis points. (Pl.'s Br. at 7.) The agreement was to last one year but could "be terminated without cause by either party upon thirty (30) days written notice to the other." (J.A. at 20.) Sterling geared up for the network competition. It hired two people to service both the TMC system and a similar network. By February 1993, Sterling was performing well and had received 109 mortgage applications.

All was not, however, copacetic. Centerbank Mortgage Company ("CMC") owned TMC. CMC was also a lender on the network, and it was TMC's hope that CMC would secure a significant number of loan referrals from the FSRs. (Dep. of Former TMC President, Walter Vail at J.A. 108.) To this end, TMC management stressed its goal to the FSRs. (See Dep. of TMC Regional Manager, Nicholas Meras at J.A. 104.) FSRs were also paid higher commissions for CMC referrals. Eventually, according to Sterling, FSRs were specifically discouraged from referring loans to Sterling, (J.A. 45-46), and ultimately, on April 27, 1993, TMC's Regional Manager Nicholas Meras issued a memorandum instructing the FSRs to stop accepting Sterling applications, (J.A. 42). It was not until May 14, 1993, (two and one half weeks after this effective termination) that TMC sent Sterling the thirty day notice of termination required under the agreement. That notice, which was properly executed, became effective June 14, 1993.

On July 26, 1993, Sterling filed a three count complaint against TMC and CMC (referred to collectively as "defendants") in the district court. The defendants filed an Answer and

Counterclaim alleging that Sterling had failed to pay all of TMC's fees. Following discovery, Sterling and the defendants filed cross motions for summary judgment on Sterling's affirmative claims.

In Count I of its complaint, Sterling alleged that TMC had breached the network contract by (1) encouraging its employees to dissuade customers from choosing Sterling's loan products, and (2) by terminating the contract before providing thirty days notice. (Dist. Ct. Op. at J.A. 174.) In its summary judgment motion, TMC contended that, since the contract provision at issue simply provided that TMC "may" submit loans to Sterling, TMC was under no obligation to refer any loans to Sterling, and therefore could not be held in breach of the agreement. The district court agreed, and granted TMC's motion for summary judgment on Count I. It reasoned that, because TMC's referral of loans to Sterling was completely discretionary, Sterling was unable, as a matter of law, to establish that the agreement was breached. (Dist. Ct. Op. at J.A. 175.)

In Count III, Sterling charged that TMC's behavior breached the implied covenant of good faith and fair dealing under Connecticut law. The court concluded that, while every contract carries this implied covenant "which requires that neither party do anything that will injure the right of the other party to receive the benefits of the agreement," such principle "cannot be applied to achieve a result contrary to the clearly expressed terms of the contract." (Dist. Ct. Op. at J.A. 176.) According to the court, "under the clearly expressed terms of the agreement . . . The Mortgage Corner had total discretion as to whether to refer loan applications to Sterling." (Dist. Ct. Op. at J.A. 176.) The court granted TMC's motion for summary judgment on Count III as well.

Sterling's Count II alleged that the defendants' steering of consumers to CMC tortiously interfered with Sterling's prospective economic relationship with both TMC and potential customers. The district court noted that the defendants had directed loan applications to CMC and had paid higher commissions on loans placed there. (Dist. Ct. Op. at J.A. 177 (citation omitted).) However, such conduct, the court reasoned, could not form the basis of a tortious interference claim in this case. Because TMC had no obligation to originate any loans with Sterling, neither defendant by its actions could have "lured away" any of Sterling's customers. Therefore, no genuine issue of material fact existed as to the "gravamen of a tortious interference claim is 'the luring away, by devious, improper and unrighteous means, of the customer of another' . . . ." (Dist. Ct. Op. at J.A. 177-78 (citation omitted)). As an alternative basis for its holding, the district court stated that the dispute was not covered by tort principles because a party could not tortiously interfere with its own contract. (Dist. Ct. Op. at J.A. 178.)

Sterling appeals the district court's determinations. Our review of the district court's grant of summary judgment is plenary, See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1985).

II.

A.

We first take up the district court's grant of summary

judgment for the defendants on Sterling's Count I claim that TMC's attempt to discourage FSRs from offering Sterling's loans and TMC's premature termination of Sterling's relationship constituted a breach of contract. As noted above, the district court viewed the relevant contract clause, "[TMC] may submit completed Mortgage Loan Applications [to Sterling]," (J.A. at 18), as unambiguously granting TMC complete discretion in the referral process, (Dist. Ct. Op. at J.A. 175). As such, the court concluded that any actions by TMC that might have inhibited referral could not violate the contract. (Dist. Ct. Op. at J.A. 175.)

The use of the word "may" in Sterling's contract could, of course, signal a discretionary duty on the part of TMC. However, Sterling argues, and we agree, that the clause setting forth TMC's responsibilities is ambiguous. According to Sterling's submission, it expected and was entitled to participate in a fair competition to attract borrowers. Along with other lenders, Sterling would fax its mortgage rates to TMC. TMC, through its FSRs, would then display those rates to consumers. If a consumer chose Sterling's proposed mortgage arrangement, TMC was supposed to submit to Sterling the completed mortgage application. In other words, TMC was obligated to submit bids to Sterling, but only in the event that a consumer opted to apply for a loan from Sterling. Under this persuasive interpretation, TMC's attempts to avoid directing referrals to Sterling could constitute a breach of contract, and the word "may" refers merely to the contingent (rather than the discretionary) nature of the referrals.

As with any ambiguous term, the district court should have admitted extrinsic evidence to ascertain its meaning. See, e.g., Hare v. McClellan, 662 A.2d 1242, 1249 (Conn. 1995); Levine v. Massey, 654 A.2d 737, 744 (Conn. 1995) (Berdon, J., dissenting). The court thus incorrectly granted summary judgment to the defendants based on a plain reading of the contract; rather it should have permitted extrinsic evidence to establish the actual rights and responsibilities of the parties.

B.

The district court should also not have granted summary judgment for the defendants on Sterling's Count III claim of a breach of the covenant of good faith and fair dealing. That covenant prohibits each party to a contract from engaging in behavior that would thwart the other's rational expectations. In the majority of states, "even though the express terms of a contract appear to permit unreasonable action, the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations." 3A Arthur L. Corbin, Corbin on Contracts § 654A(B) at 89 (Supp. 1994). Although Connecticut recognizes that the good faith covenant protects the parties' expectations, it takes a more restrictive position than the majority. In Connecticut, the covenant cannot be applied to achieve a result contrary to the clearly expressed termsof a contract unless those terms are contrary to public policy. Eis v. Meyer, 566 A.2d 422, 426 (Conn. 1989). Sterling argues that the defendants' behavior violated its reasonable expectation that it was to participate in a fair competition.

In Warner v. Konover, 553 A.2d 1138 (Conn. 1989), the

Connecticut Supreme Court applied the covenant of good faith and fair dealing to a landlord-tenant agreement.  The lease arrangement in Warner prohibited the tenant from assigning his interest without the written consent of the landlords.  Id. at 1139.  When the landlords conditioned tenant's assignment on a renegotiation of the rental payment, the tenant brought suit.  Id. at 1140.  The landlords argued that, absent a clause in the lease specifying that consent could not be unreasonably withheld, they retained unfettered discretion to withhold consent.  Id.

The trial court agreed and dismissed the tenant's complaint, but the Supreme Court reversed.  Id.  The Supreme Court explained that "'[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'"  Id. (quoting Restatement (Second) of Contracts § 205).  It then reasoned that a landlord "who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing."  Id. at 1140-41.  The court refused to say whether the landlords had in fact breached the covenant, as that determination would involve a complex evaluation of the defendants' "faithfulness to an agreed common purpose and consistency with the justified expectations of the [tenant] . . . ."  Id.  Nonetheless, the plaintiff's claim alleged sufficient indicia of a breach to survive summary judgment.

Shortly after Warner, the Connecticut Supreme Court refused to apply the good faith covenant to a case involving an easement.  Eis v. Meyer, 566 A.2d 422 (Conn. 1989).  In Eis, the plaintiff's deed provided that upon expansion of his home, his easement over the defendant-neighbor's property would be extinguished.  Id. at 423.  The plaintiff informed the defendant of his plan to build an addition.  Id.  Knowing that this action would extinguish the easement, the defendant remained quiet  -- at least until the addition was built, at which point she promptly terminated the plaintiff's easement.  Id.  Plaintiff claimed that defendant's underhandedness was a violation of the implied covenant of good faith and fair dealing, but the Supreme Court disagreed.  Id. at 425.

Acknowledging that the covenant had been applied to the lease in Warner, the court distinguished that case.  In Warner, the landlord had retained discretion to withhold consent to assignment of the lease.  Id. at 426.  "The express terms of the lease, however, did not establish the parameters of that discretion.  Accordingly, we held that implicit in the terms of the lease was that the landlord's discretion must be exercised in a manner consistent with good faith and fair dealing."  Id. (citations omitted).  By contrast, the clearly expressed terms of the deed in Eis "contemplated termination only upon an affirmative act of the dominant tenement owner [i.e. the plaintiff in this case]."  Id.  To condition termination on the silence of the burdened landowner would contradict the express terms of deed.  Id. at 426.  Although the implied covenant of good faith and fair dealing is a rule of construction used to fulfill the reasonable expectations of the parties, it could not be applied to achieve a result contrary to the clearly expressed terms of a contract.  Id.

Using the aforementioned principles as our guide, we consider the district court's grant of the defendants' motion for summary judgment on the breach of the implied covenant of good faith. Although the district court provided little explication of its reasoning, it seemed to conclude that, even if Sterling rationally expected to participate in a fair competition, the contract language that TMC "may" direct loans to Sterling granted TMC complete discretion in the referral process. On this theory, any determination that TMC breached the implied covenant of good faith by failing to refer loans to Sterling would contradict the express terms of the contract making referral discretionary. (Dist. Ct. Op. at J.A. 176.)

We disagree. Even if TMC did have total discretion to direct loans to Sterling, its behavior could still violate the covenant of good faith and fair dealing. According to Sterling's submission, TMC billed the network as an even competition among lenders when, in fact, the network was rigged in CMC's favor. Such a misrepresentation would be evidence of TMC's bad faith. Furthermore, as Warner makes clear, when a contract has afforded a party unbounded discretion, it is perfectly proper to impose a duty on that party to exercise its discretion in good faith. In Warner, the landlords had unrestricted power to refuse assignments. But implicit in this power was a requirement that they wield it fairly. Warner, 553 A.2d at 1140-41. Accordingly, TMC's seeming discretion to refer loans should have been exercised in conformance with Sterling's reasonable expectations.

Moreover, unlike the clear specifications for easement termination in Eis, the contract condition that TMC "may refer" loans to Sterling is an ambiguous requirement subject to several interpretations. "May" can indicate discretion, but as we have earlier noted, may can also indicate a conditional occurrence or event. The simple fact that this clause is amenable to more than one interpretation indicates that subjecting the defendant's performance to a good faith requirement could not violate the contract's express terms.

In sum, Sterling's claim that TMC's actions in dissuading consumers from choosing its product and prematurely terminating its contract breached the covenant of good faith and fair dealing is sufficient to survive summary judgment.

C.

In Count II, Sterling alleged that the defendants' practice of steering loans to CMC constituted tortious interference with its prospective economic relationship with both TMC and potential borrowers. More specifically, Sterling complained about the higher commissions paid to FSRs for CMC referrals and the reminders that FSRs received about the increased profitability of placing loans with CMC. (Pl.'s Br. at 21.) According to Sterling, CMC's "special advantages" were never disclosed to it; rather, Sterling was led to believe that its loans competed on a level field with all other lenders.

This claim need not detain us long. Whether or not Sterling has otherwise met the various requirements of the leading New Jersey case regarding tortious interference, see Printing Mart-

Morristown v. Sharp Electronics Corp., 563 A.2d 31 (N.J. 1989), it has not advanced sufficient evidence to survive summary judgment.

There is evidence of relevant acts committed by TMC. For example, Nicholas Meras, TMC's Regional Manager, reminded the FSRs about the lucrative nature of CMC loans, and ultimately issued a memorandum instructing the FSRs to stop accepting Sterling applications. But, it is axiomatic that TMC cannot be said to have tortiously interfered with its own contract. Therefore, the only possible viable claim as to tortious interference could be against CMC. The most that Sterling adduces as to CMC, however, is the conclusory allegation that CMC gave incentives to the FSRs, such as higher commissions, to steer loans to CMC. No other acts are cited to support a tortious interference claim. This showing is insufficient to survive summary judgment.

CMC is the parent of TMC, and perhaps there is evidence somewhere that CMC dictated TMC's allegedly offending decisions. However, it was up to Sterling to come forward with such evidence to raise a triable issue and to defeat the motion. Mere speculation about the possibility of the existence of such facts does not entitle Sterling to go to trial. And, even if a parent may be liable for a subsidiary's decisions on how to manage its commercial relationships, that is not enough to establish tortious interference with prospective economic relations as contemplated by Printing–Mart. The summary judgment with respect to the tortious interference claim will therefore be affirmed.

### III.

For the foregoing reasons, the judgment of the district court will be affirmed as to Count II and reversed as to Counts I and III and remanded for further proceedings with respect to those counts.

_____