KENNETH SIMS *v.* HONDA MOTOR
COMPANY, LTD., ET AL.
(14565)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and KATZ, Js.

Argued January 6—decision released April 20, 1993

*Elizabeth A. Gallagher,* with whom, on the brief, was
*William F. Gallagher,* for the appellant (plaintiff).

*Jeremy G. Zimmermann,* with whom were *Elizabeth P. Gilson* and, on the brief, *Robert A. Calinoff,* pro hac vice, for the appellees (defendants).

PETERS, C. J. The sole issue in this case, on certification from the United States District Court, is whether, pursuant to General Statutes § 52-572e,[1] an alleged tortfeasor is, as a matter of law, discharged from liability to an injured party by virtue of a general release agreement executed by the injured party that purports to release not only a specifically named tortfeasor, but also all other potentially liable parties, for consideration paid by the named tortfeasor. The plaintiff, Kenneth Sims, filed a product liability action in the United States District Court for the District of Connecticut, alleging that the defendants, Honda Motor Company, Ltd., Honda Research and Development, Ltd., American Honda Motor Company, Inc., and Freedom Corporation, doing business as Freedom Honda,[2] were liable for injuries that Sims sustained while riding a Honda motorcycle. Honda filed an amended answer and asserted special defenses alleging, inter alia, that Sims' claim was barred because Sims, in his settlement with another tortfeasor in the motorcycle accident, had executed a general release of all potential tortfeasors. Sims denied the allegations made in the special defenses, and Honda thereafter moved for summary judgment on the basis of the release. The District Court subsequently certified to this court, pursuant to General Statutes § 51-199a[3] and Practice Book

[1] "[General Statutes] Sec. 52-572e. RELEASE OF JOINT TORTFEASOR. (a) For the purposes of this section the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property whether or not a judgment has been recovered against all or any of them.

"(b) A release by the injured person, or his legal representative, of one joint tortfeasor does not discharge the other tortfeasors unless, and only to the extent, the release so provides."

[2] We will herein refer to the defendants collectively as Honda.

[3] General Statutes § 51-199a provides in relevant part: "UNIFORM CERTIFICATION OF QUESTIONS OF LAW ACT. . . .

"(b) The supreme court may answer questions of law certified to it by . . . a United States district court when requested by the certifying court if there are involved in any proceeding before it questions of law of this

§ 4168,[4] several questions relating to the effect of the release. We accepted the certified questions,[5] and now hold that the effect of the release depends upon the contracting parties' intent regarding the release of other potentially liable parties.

The District Court record reveals the following facts, which were alleged by Sims in his complaint or stipulated to by the parties. In 1986, Sims purchased a new Honda motorcycle. On May 29, 1987, while riding the Honda motorcycle, Sims was struck by a vehicle owned and operated by Emanuel Byrd. As a result of injuries sustained in the collision, Sims' left leg was amputated

---

state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state."

[4] Practice Book § 4168 provides: "[CERTIFIED QUESTIONS FROM FEDERAL COURTS]——IN GENERAL

"The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States or a United States district court when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state."

[5] The District Court certified the following questions of law to this court:

"1. Whether unspecified tortfeasors are effectively discharged pursuant to preprinted language in a general form release, where said tortfeasors neither participated in negotiations resulting in the release nor contributed to the consideration for which the release was given;

"2. Whether the preprinted language in a general form release releasing 'any and all other persons, firms and corporations' provides for the discharge of other tortfeasors known to the other releasing party or his representative at the time the release was executed;

"3. Whether a release's preprinted language releasing 'any and all other persons, firms and corporations' provides for the discharge of other tortfeasors where the releasing party did not intend to release said tortfeasors and where the release was in a form required and prepared by the insurer of the tortfeasor to be released; and

"4. Whether § 52-572e (b) of the Connecticut General Statutes precludes the release of a joint tortfeasor unless that tortfeasor is expressly designated."

above the knee. Sims also suffered severe shock to his nervous system, severe pain, mental anguish, nervousness and permanent scarring.

After the collision, Sims, represented by counsel, entered into negotiations with Byrd's insurer, and subsequently executed a release of claims that Byrd's insurer had prepared. The release provided that Sims would receive $50,000 from Byrd and his insurers in consideration for Sims' agreement to "release, acquit and forever discharge" Byrd and his insurers, as well as "any and all" other parties, from "any and all" claims arising out of the May 29, 1987 collision.[6] Honda

---

[6] The release provides in its entirety:

"RELEASE OF ALL CLAIMS

FOR AND IN CONSIDERATION OF the payment to me/us of the sum of Fifty Thousand Dollars and xx/100 Dollars ($50,000.00), and other good and valuable consideration, I/we, being of lawful age, have released and discharged, and by these presents do for myself/ourselves, my/our heirs, executors, administrators and assigns, release, acquit and forever discharge Emanuel Byrd, AIU Insurance Company and American International Adjustment Company and any and all other persons, firms and corporations of and from any and all actions, causes of action, claims or demands for damages, costs, loss of services, expenses, compensation, consequential damage or any other thing whatsoever on account of, or in any way growing out of, any and all known and unknown personal injuries and death and property damage resulting or to result from an occurrence or accident that happened on or about the 29th day of May, 1987, at or near Bassett Street, New Haven, Connecticut

I/we hereby acknowledge and assume all risk, chance or hazard that the said injuries or damage may be or become permanent, progressive, greater, or more extensive than is now known, anticipated or expected. No promise or inducement which is not herein expressed has been made to me/us, and in executing this release I/we do not rely upon any statement or representation made by any person, firm or corporation, hereby released, or any agent, physician, doctor or any other person representing them or any of them, concerning the nature, extent or duration of said damages or losses or the legal liability therefor.

I/we understand that this settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of the persons, firms and corporations hereby released by whom liability is expressly denied.

was neither a party to the negotiations that led to the execution of the release, nor did it contribute to the consideration given to Sims.

In response to Honda's motion for summary judgment in the District Court, the attorney who had represented Sims in the negotiations with Byrd's insurers filed an affidavit stating that the product liability action against Honda had been under consideration at the time Sims had executed the release. The attorney also stated that he had never intended that Sims would release Honda from liability by signing the release. Sims also filed an affidavit in the District Court stating that, when he had signed the release, he had had no intention of releasing Honda from liability.

In his brief in this court, Sims claims that the release is not effective to discharge Honda from liability as a matter of law because, under § 52-572e, only those tortfeasors expressly named in a release are discharged from liability, unless the releasing party manifestly intended to release unnamed tortfeasors. Sims contends, therefore, that the language, "any and all other persons, firms and corporations," in the release that he executed is ambiguous as to whether it releases Honda and, accordingly, that it must be construed in his favor.

Honda claims, on the other hand, that the language of § 52-572e does not require a release to designate

---

This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

I/we further state that I/we have carefully read the foregoing release and know the contents thereof, and I/we sign the same as my/our own free act.

WITNESS my hand and seal this 2 day of February, 1988

CAUTION! READ BEFORE SIGNING

/s/ Kenneth L. Sims"

(Those portions of the release that were typewritten on preprinted lines appear herein as underlined. All other portions of the release were preprinted.)

Two individuals witnessed the agreement.

expressly those tortfeasors that the parties sought to discharge from liability. Honda asserts, therefore, that the language in question is effective to release it from liability. Honda also contends, in the alternative, that the language of the release must be interpreted in light of the parties' intent and that the release executed by Sims must, as a matter of law, be held effective to discharge Honda, a potential tortfeasor known to Sims at the time he executed the release.[7]

The certified issue is one of first impression in this court, although it has been addressed in other jurisdictions and in one published Superior Court decision. We conclude that a general release like that signed by Sims, which provides for the release of "any and all other persons, firms and corporations," discharges only those joint tortfeasors whom the contracting parties actually intended to be released.

I

At common law in Connecticut, a release of one joint tortfeasor operated as a release of all joint tortfeasors. See *Dwy* v. *Connecticut Co.,* 89 Conn. 74, 77, 92 A. 883 (1915). "The traditional rationale given for this rule was that where two or more tortfeasors acted in concert to cause an injury, the act of one became the act of all and a single cause of action, with each participant being liable for the entire loss sustained by the plaintiff." *Neves* v. *Potter,* 769 P.2d 1047, 1049 (Colo. 1989). This common law rule was widely criticized by courts and commentators as unjust because it served as a trap for unknowing plaintiffs, barring them from suing addi-

---

[7] Honda has made no claim that Sims' complaint is barred because his recovery from Byrd and Byrd's insurers constituted full compensation for his injuries. Cf. *Bjork* v. *Chrysler Corporation,* 702 P.2d 146, 156 (Wyo. 1985); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 49, p. 335 ("Where there has been such full satisfaction . . . no claim should remain as to any other tortfeasor; but these are questions of fact, and normally to be determined by the jury, where the amount of the claim is unliquidated.").

tional tortfeasors and, in some cases, from obtaining full relief for their injuries. See, e.g., *McInnis* v. *Harley-Davidson Motor Co.,* 625 F. Sup. 943, 947 (D.R.I. 1986) (applying Rhode Island law); *Moore* v. *Missouri Pacific Railroad,* 299 Ark. 232, 239–40, 773 S.W.2d 78 (1989); *Bjork* v. *Chrysler Corporation,* 702 P.2d 146, 152–54 (Wyo. 1985); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 49, p. 333; R. Satter, "Changing Roles of Courts and Legislatures," 11 Conn. L. Rev. 230, 236 (1979); see also *Fulmore* v. *Coleman,* 41 Conn. Sup. 353, 354, 574 A.2d 1337 (1989) (*Berdon, J.*).

In 1969, the Connecticut legislature abrogated the common law rule by enacting General Statutes § 52-572e, which derives from the Uniform Contribution Among Tortfeasors Act.[8] Public Acts 1969, No. 69-143. Section 52-572e provides in relevant part: "(b) A release by the injured person, or his legal representative, of one joint tortfeasor does not discharge the other tortfeasors *unless, and only to the extent, the release so provides.*" (Emphasis added.)

As the Illinois Supreme Court noted regarding a statute similar to § 52-572e, "[t]he legislature intended to abolish the common law rule that produced an *involuntary* discharge of joint tortfeasors." (Emphasis added.) *Alsup* v. *Firestone Tire & Rubber Co.,* 101 Ill. 2d 196, 201, 461 N.E.2d 361 (1984). Moreover, the Illinois court held that, if a general release were construed to discharge all tortfeasors regardless of whether their release had been contemplated by the contracting parties, "an important purpose of the [statute] would be

[8] Section 4 of the Uniform Contribution Among Tortfeasors Act (1955 Rev.) provides in relevant part: "When a release . . . is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

"(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide . . . ." 12 U.L.A. 98 (1975).

thwarted by the unintended release of persons who were strangers to the release contract." Id. Accordingly, we conclude that § 52-572e reflects a legislative preference for preserving an unknowing injured party's opportunity to seek relief from responsible tortfeasors and a policy against enforcing an injured party's involuntary discharge of responsible tortfeasors.

## II

The primary issue in this case is one of contract interpretation: does the general release executed by Sims provide for the release of Honda within the meaning of § 52-572e?[9] In jurisdictions with statutes similar to § 52-572e, courts interpreting releases with all-inclusive language, like that in the release executed by Sims, have generally taken one of three approaches, none of which appears to have captured a majority.

## A

Some courts have adopted a "flat bar" rule, holding that, as a matter of law, a release "provides" for the discharge of all potential joint tortfeasors if it purports to discharge not only the named tortfeasors, but also any and all other parties. See, e.g., *Mussett* v. *Baker Material Handling Corporation,* 844 F.2d 760, 762 (10th Cir. 1988) (applying Oklahoma law); *State Farm Mutual Automobile Ins. Co.* v. *Reynolds,* 676 F. Sup. 106, 107 (W.D. Va. 1987) (applying Virginia law); *Doganieri* v. *United States,* 520 F. Sup. 1093, 1097 (N.D. W. Va. 1981) (applying West Virginia law); *Peters* v. *Butler,* 253 Md. 7, 9–10, 251 A.2d 600 (1969); *Battle* v. *Clanton,* 27 N.C. App. 616, 621, 220 S.E.2d 97 (1975), cert. denied, 289 N.C. 613, 223 S.E.2d 391 (1976); *Hasselrode* v. *Gnagey,* 404 Pa. 549, 552–53, 172 A.2d 764

---

[9] The parties agree that Honda is a joint tortfeasor within the meaning of General Statutes § 52-572e.

(1961). The "flat bar" rule yields a broad construction of both the "so provides" language of the statute and the "any and all" language of the release.

Most "flat bar" courts hold that, because a release purporting to discharge all other parties from liability is unambiguous, it must be construed with reference only to the language used and not to any extrinsic evidence of the parties' intent. See *Mussett* v. *Baker Material Handling Corporation,* supra, 762; *State Farm Mutual Automobile Ins. Co.* v. *Reynolds,* supra, 107; *Doganieri* v. *United States,* supra, 1097; *Peters* v. *Butler,* supra, 10; *Hasselrode* v. *Gnagey,* supra, 552. Reading the language within the four corners of the agreement, these courts determine that the parties manifested their intent, as a matter of law, that the release discharge all potential tortfeasors from liability.

In adopting the "flat bar" rule under Virginia law, the District Court for the Western District of Virginia noted that the unnamed joint tortfeasor is not necessarily freed from liability for the injured party's damages. *State Farm Mutual Automobile Ins. Co.* v. *Reynolds,* supra, 107–108. The court held that, despite the release's discharge of the nonsettling joint tortfeasor's liability to the injured party, the nonsettling joint tortfeasor may nonetheless be liable to the settling joint tortfeasor for contribution. The *Reynolds* court concluded that the "flat bar" rule would thus hasten payment to the injured party, leaving the liable parties to litigate their respective faults afterward. Id., 108.

We decline to adopt the "flat bar" approach because it perpetuates the inequities of the common law rule and contravenes the legislative preference, expressed in § 52-572e, for preserving the opportunity of an unknowing injured party to seek relief. By presuming that the actual intent of parties was fully incorporated

into the release, the "flat bar" rule precludes an injured party from seeking further relief from a nonsettling joint tortfeasor.

## B

A second group of courts has adopted a "specific designation" rule under which, as a matter of law, a general release discharges only those tortfeasors that are expressly identified. See, e.g., *Moore* v. *Missouri Pacific Railroad,* supra, 240; *Alsup* v. *Firestone Tire & Rubber Co.,* supra, 201; *Aid Ins. Co.* v. *Davis County,* 426 N.W.2d 631, 633 (Iowa 1988); *Beck* v. *Cianchetti,* 1 Ohio St. 3d 231, 235, 439 N.E.2d 417 (1982); *Bjork* v. *Chrysler Corporation,* supra, 163; see also *Duncan* v. *Cessna Aircraft Co.,* 665 S.W.2d 414, 419 (Tex. 1984) (adopting the "specific designation" rule in the absence of a statute similar to § 52-572e). Courts adopting this rule generally hold that naming the released parties is not necessary if those parties are sufficiently described with terms such as "employees" or "the driver of the car." See, e.g., *Moore* v. *Missouri Pacific Railroad,* supra; *Aid Ins. Co.* v. *Davis County,* supra, 633–34; *Beck* v. *Cianchetti,* supra. This approach yields a narrow construction of both the release and the statute's "so provides" language.

Adoption of the "specific designation" rule is generally supported by reference to the historical development of the law of releases. Courts adopting the "specific designation" rule generally conclude that interpreting a general release to discharge from liability all tortfeasors, whether named in the release or not, would, in effect, perpetuate the inequity of the common law rule. See, e.g., *Alsup* v. *Firestone Tire & Rubber Co.,* supra, 201; *Aid Ins. Co.* v. *Davis County,* supra, 634; *Beck* v. *Cianchetti,* supra, 235. Moreover, "specific designation" courts base their adoption of this approach on their determination that this rule provides

the best means of ascertaining the parties' intent. See, e.g., *Moore* v. *Missouri Pacific Railroad,* supra, 240; *Bjork* v. *Chrysler Corporation,* supra, 162–63.

We reject the "specific designation" approach because, in our view, it reads § 52-572e more expansively than the legislature intended. This approach interprets § 52-572e as effectively prohibiting general releases, rather than merely abolishing the automatic legal effect of a release of one tortfeasor. Because the "specific designation" approach does not seek to ascertain the parties' actual intent, but simply replaces the legal construct of the common law rule with another legal presumption, this approach is inconsistent with the legislature's choice not to prohibit general releases per se.

Moreover, we note that courts adopting the "specific designation" rule appear to view the question of the effect of the release as one of statutory interpretation: what does "provide" mean? We consider the certified issue to raise instead a question of contract interpretation: to what did the parties agree?[10] For these reasons, we reject the "specific designation" rule.

---

[10] Some proponents of the "specific designation" rule assert that that approach properly construes the statutory term "provides" narrowly, in accordance with the prevailing canon of construction that a statute in derogation of the common law be narrowly construed. See, e.g., *Bjork* v. *Chrysler Corporation,* 702 P.2d 146, 162 (Wyo. 1985); see generally *Union Trust Co.* v. *Heggelund,* 219 Conn. 620, 626, 594 A.2d 464 (1991); but see generally *Nickel Mine Brook Associates* v. *Joseph E. Sakal, P.C.,* 217 Conn. 361, 364, 585 A.2d 1210 (1991) (statute in derogation of common law is to be liberally construed if its purpose is remedial). If this rule of construction were applicable in this case at all, however, it would seem to support adoption of the "specific designation" rule. The rule of statutory construction that encourages narrow construction of statutes in derogation of the common law generally promotes narrow construction of the statute's change in the common law. "[N]o statute is to be construed as altering the common law, farther than its words import." (Internal quotation marks omitted.) *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 137, 479 A.2d 231 (1984). In this case, therefore, that rule of construction would

## C

Other courts have taken a third approach to the construction of general releases: the "intent" rule. Rather than presume that the parties' intent was fully expressed within the four corners of the release or that, despite the broad language of the release, the parties did not intend it to discharge all joint tortfeasors from liability, these courts consider extrinsic evidence of the parties' intent to determine the scope of the release. See, e.g., *McInnis* v. *Harley-Davidson Motor Co.,* supra, 957 (applying Rhode Island law); *Neves* v. *Potter,* supra, 1053; *Flanagan* v. *Department of Transportation,* 532 So. 2d 714, 715 (Fla. App. 1988) (citing *Hurt* v. *Leatherby Ins. Co.,* 380 So. 2d 432, 434 [Fla. 1980]); *Williams* v. *Physicians & Surgeons Community Hospital, Inc.,* 249 Ga. 588, 590, 292 S.E.2d 705 (1982). These jurisdictions note that the "intent" rule provides a middle road between the more extreme "flat bar" and "specific designation" rules, both of which employ legal fictions regarding the parties' intent. See, e.g., *McInnis* v. *Harley-Davidson Motor Co.,* supra, 949. "Logically, it is the intentions of the actors, rather than the presence or absence of buzzwords, which should govern." Id., 955.

"Intent" rule jurisdictions justify consideration of extrinsic evidence of the parties' intent on various grounds. For example, the Florida Supreme Court held that a general release was ambiguous because of the presence of written and printed language in a single form, thereby warranting admission of extrinsic evidence to interpret that ambiguity. *Hurt* v. *Leatherby Ins. Co.,* supra, 434. Other courts, however, have held,

---

seem to advise against the "specific designation" rule, which moves further from the common law rule than General Statutes § 52-572e necessarily suggests, and in favor of the "flat bar" rule, which allows the common law rule to continue to the extent possible under the statute.

even without a prior determination that the release is ambiguous, that extrinsic evidence is admissible to aid the court in ascertaining the parties' intent because a stranger to a contract (the nonsettling joint tortfeasor) cannot prevent the introduction of extrinsic evidence for that purpose. *McInnis* v. *Harley-Davidson Motor Co.,* supra, 952; *Neves* v. *Potter,* supra, 1054.

## D

We are persuaded that the "intent" rule best implements the goals of § 52-572e. By abrogating the common law rule that a release of one tortfeasor discharges, by operation of law, all joint tortfeasors, § 52-572e preserves the right of the injured party to choose to release one or all joint tortfeasors in accordance with the intent of the negotiations between the injured party and the settling tortfeasor. Under § 52-572e, therefore, the contracting parties' intent, not the operation of a legal rule, determines the scope of a release. See *McInnis* v. *Harley-Davidson Motor Co.,* supra, 949 ("intent" rule court noting importance of ascertaining parties' intent); *Hasselrode* v. *Gnagey,* supra, 552 ("flat bar" rule court noting that intent of the parties, as expressed within four corners of release, governs scope of release); *Bjork* v. *Chrysler Corporation,* supra, 161 ("specific designation" rule court noting the importance of ascertaining parties' intent).

The "intent" rule best furthers the purpose of § 52-572e because it enables courts to ascertain the parties' *actual* intent. Free of irrebuttable presumptions regarding the intended scope of often boilerplate releases, this approach provides for consideration of extrinsic evidence of the parties' actual intent and does not confine interpretation of the release to its four corners.

The consideration of extrinsic evidence of the parties' intent regarding the scope of the release, whether

ambiguous or not, is appropriate because such consideration will best further the purpose of § 52-572e, which in our view is to permit the release of one joint tortfeasor to effect the release of other joint tortfeasors only if the settling parties so intended. In light of this statutory purpose, the "boilerplate" nature of the general release language in the agreement executed by Sims raises the specter of an adhesion contract; cf. *Aetna Casualty & Surety Co.* v. *Murphy,* 206 Conn. 409, 416–18, 538 A.2d 219 (1988) (notice provisions of adhesion contract not literally enforced); or at least cautions against presuming that the language of the release reflects the parties' intent regarding its scope. See also *Hurt* v. *Leatherby Ins. Co.,* supra, 433–34. We are, therefore, disinclined to allow the mere presence of words of general release to frustrate the purpose of § 52-572e.

Analogous cases from other jurisdictions support our conclusion that extrinsic evidence of intent is appropriately considered in determining the scope of a general release. For example, in interpreting two "dragnet clauses"[11] that purported to secure payment of " 'any and all other indebtedness of Borrower to [the bank giving the loan],' " the Mississippi Supreme Court held that the language, " 'any and all other indebtedness,' " did not encompass all debts owed by the borrower to the bank. *Merchants National Bank* v. *Stewart,* 608 So. 2d 1120, 1125 n.4 (Miss. 1992). The court reached this conclusion after ascertaining the parties' probable intent by determining each party's awareness of the

---

[11] A "dragnet clause" is "a mortgage provision which purports to make the real estate security for other, usually unspecified debts [and which f]requently . . . is included in the printed language of mortgages drafted by the mortgagee." *First Security Bank of Utah* v. *Shiew,* 609 P.2d 952, 954 (Utah 1980). A typical "dragnet clause" provides that the mortgage " 'secure[s] the payment of any and all claims or demands . . . which the said mortgagee . . . may have or hold against the mortgagors or either of them . . . .' " Id., 953.

various debts and after noting that the clauses were " 'boilerplate' in nature." Id., 1126. The court ended its discussion of the dragnet clauses by stating, "the fact that these notes were otherwise fully secured, further indicates that they were not *intended* to be included under the . . . agreements." (Emphasis added.) Id., 1127; see also *Wong* v. *Beneficial Savings & Loan Assn.,* 56 Cal. App. 3d 286, 293, 128 Cal. Rptr. 338 (1976) ("California courts have rather consistently tended to prefer a construction that is more faithful to the parties' actual expectations than to the literal wording of the clause." [Emphasis omitted; internal quotation marks omitted.]); *First Security Bank of Utah* v. *Shiew,* 609 P.2d 952, 957 (Utah 1980) (refusing to enforce the literal terms of dragnet clause because "[t]here is not a scintilla of evidence to support the inference the parties intended the second loan to be under the security of the first loan").

We recognize that our conclusion is a departure from the general rule of contract construction that unambiguous contract provisions are to be given their plain meaning without reference to evidence outside the four corners of the agreement. See *Aetna Casualty & Surety Co.* v. *CNA Ins. Co.,* 221 Conn. 779, 786, 606 A.2d 990 (1992); *F & W Welding Service, Inc.* v. *ADL Contracting Corporation,* 217 Conn. 507, 517, 587 A.2d 92 (1991). Rigid application of that general rule would, however, frustrate the purposes of § 52-572e, which counsels against uncritical enforcement of boilerplate general release language and, therefore, justifies treating such language differently from how we treat other contractual provisions. Accordingly, we hold that, in light of the purposes of § 52-572e, general releases like that executed by Sims are not subject to that traditional rule of contract construction. Cf. *State* v. *Cain,* 223 Conn. 731, 738–39, 613 A.2d 804 (1992) ("[w]e conclude . . . that despite the fact that the language of Prac-

tice Book §, 749 [2], read literally, would cover the tape recording of a 911 telephone call, it is not within the intent of that language to cover such a tape recording and that, therefore, a tape recording of a 911 telephone call is not a 'statement' within the meaning of § 749 [2]'').

Finally, the parol evidence rule does not prevent consideration of extrinsic evidence of the parties' intent in the interpretation of the scope of general releases. The parol evidence rule is a substantive rule of contract law that "prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract." *TIE Communications, Inc.* v. *Kopp,* 218 Conn. 281, 287–88, 589 A.2d 329 (1991); see also General Statutes § 42a-2-202 (Uniform Commercial Code). The parol evidence rule, however, is not absolute, but admits of various exceptions, some of which are based on equitable considerations. For instance, Connecticut allows extrinsic evidence of the parties' intent to show that a written contract is founded in mistake or fraud. See, e.g., *TIE Communications, Inc.* v. *Kopp,* supra, 289; *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 742, 557 A.2d 525 (1989). In addition, other jurisdictions have held that the parol evidence rule does not bar extrinsic evidence of the parties' intent if it is a stranger to the contract who seeks to prevent the introduction of extrinsic evidence. See, e.g., *McInnis* v. *Harley-Davidson Motor Co.,* supra, 952; *Neves* v. *Potter,* supra, 1054. These courts take an "unsympathetic position toward parties who seek to take gratuitous advantage of an agreement when they are not parties to the agreement." *Neves* v. *Potter,* supra.

General releases like that executed by Sims present a compelling case for creating a limited exception to the parol evidence rule because at least one of the purposes underlying that rule does not apply in the context of such releases. For example, one purpose of the

parol evidence rule is "to secure business stability." J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 3-2 (b), p. 137. Because the negotiation of a release in settlement of personal injury claims, however, is more akin to a consumer transaction than a commercial transaction, this purpose is not dispositive in this case. Cf. *Harlach* v. *Metropolitan Property & Liability Ins. Co.*, 221 Conn. 185, 190, 602 A.2d 1007 (1992) ("The contractual nature of insurance and the commercial relationship between insurer and insured are not altered by any peculiarities of uninsured motorist coverage. The relationship between the insured and the insurer clearly is *contractual* in nature, and we find nothing in [the uninsured motorist statute] that alters the traditionally commercial setting in which insurance policies are purchased." [Emphasis in original; internal quotation marks omitted.]). We conclude, therefore, that it is appropriate, in the circumstances of this case, to create a limited exception to the parol evidence rule.

In adopting the "intent" approach to interpreting general releases in Connecticut, we are not unaware of the criticism that the application of this rule may deprive the settling tortfeasor of some important protection that, for the settling tortfeasor's own sake, may have been part of the bargain memorialized by the release. This criticism arises out of the possibility that a settling tortfeasor may be impleaded by a nonsettling joint tortfeasor in a subsequent suit against that joint tortfeasor by the injured party or may be subject to contribution to a joint tortfeasor who makes some payment to the injured party. We are not persuaded by this criticism.

The possibility that a settling tortfeasor may incur further liability to another tortfeasor is not fanciful. Although the common law of this state entirely prohibited contribution among joint tortfeasors; see *Therrien* v. *Safeguard Mfg. Co.*, 180 Conn. 91, 95, 429 A.2d

808 (1980); *Gomeau* v. *Forrest,* 176 Conn. 523, 524, 409 A.2d 1006 (1979); the legislature has enacted statutes allowing a tortfeasor to implead, in certain circumstances, potentially liable joint tortfeasors. See, e.g., General Statutes §§ 52-572o (e) and 52-102a (a); see also *Malerba* v. *Cessna Aircraft Co.,* 210 Conn. 189, 195–96, 554 A.2d 287 (1989). A settling tortfeasor therefore runs the potential risk of being held liable to a joint tortfeasor if the injured party subsequently elects to pursue a claim against such a joint tortfeasor.

The possibility that a settling tortfeasor may have a personal interest in the execution of a general release is not, however, a persuasive argument against the "intent" rule. In searching for the intent of the parties at the time of the execution of the release, the trier of fact must inquire into the intent of all the participants. The trial will, therefore, afford a full opportunity for evidence to be heard that a general release was precisely what the settling tortfeasor intended. Indeed, in order to meet the burden of proof regarding the scope of the release, the injured party may have to persuade the finder of fact that the settling tortfeasor intended that the release would not discharge any other tortfeasor.[12]

---

[12] It is appropriate to impose the burden of proof on the injured party seeking to recover from a joint tortfeasor because the injured party, having settled with the first tortfeasor and having executed the release, has relatively better access to evidence of its own intentions and the intentions of the settling tortfeasor. Moreover, our adoption of the "intent" approach to interpreting general releases serves to benefit an injured party who may not have intended to release all the world, notwithstanding the agreement's unambiguous boilerplate language stating that "any and all persons, firms and corporations" are discharged. This approach thus allows the injured party to introduce extrinsic evidence that varies the release's language. Given this unusual opportunity to introduce extrinsic evidence, it would be anomalous to assign the burden of proof regarding the parties' intent to the joint tortfeasor, who would in any case prefer to prohibit the introduction of extrinsic evidence and to rely instead on the unambiguous language of the release. But see *Williams* v. *Physicians & Surgeons Community Hospital, Inc.,* 249 Ga. 588, 591, 292 S.E.2d 705 (1982).

Finally, we note that the potential vulnerability of the settling tortfeasor to a joint tortfeasor in the future is not addressed by either the "specific designation" rule or the "flat bar" rule. Neither of these approaches is premised, in any way, on the settling tortfeasor's motivation to include general release language in order to avoid liability for contribution to another potentially liable joint tortfeasor.

Accordingly, because it "comports with equity and, therefore, is in harmony with the beneficent purposes of § 52-572e"; *Fulmore* v. *Coleman,* 41 Conn. Sup. 353, 355–56, 574 A.2d 1337 (1990); we adopt the "intent" rule as a guide to interpreting general releases like that executed by Sims. The trial court may consider extrinsic evidence of the parties' intent regarding the scope of the release regardless of whether the court determines that the language of the release is ambiguous.

## III

The certified questions asked: "1. Whether unspecified tortfeasors are effectively discharged pursuant to preprinted language in a general form release, where said tortfeasors neither participated in negotiations resulting in the release nor contributed to the consideration for which the release was given; 2. Whether the preprinted language in a general form release releasing 'any and all other persons, firms and corporations' provides for the discharge of other tortfeasors known to the other releasing party or his representative at the time the release was executed; 3. Whether a release's preprinted language releasing 'any and all other persons, firms and corporations' provides for the discharge of other tortfeasors where the releasing party did not intend to release said tortfeasors and where the release was in a form required and prepared by the insurer of the tortfeasor to be released; and 4. Whether

§ 52-572e (b) of the Connecticut General Statutes precludes the release of a joint tortfeasor unless that tortfeasor is expressly designated."

As to the first certified question, the answer is "Yes, unless the parties did not actually so intend." As to the second certified question, the answer is "Yes, unless the parties did not actually so intend." As to the third certified question, the answer is "No, if the released tortfeasor did not have a contrary intent." As to the fourth certified question, the answer is "No."

No costs will be taxed in this court to either party.

In this opinion the other justices concurred.