[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO STRIKE
The defendant, Carlingswitch, Inc. (Caning), has moved to strike the Application For Order To Proceed With Arbitration And Appointment of Arbitrator, dated September 19, 2000 (Application) filed by the plaintiff Wes-Garde Components Group, Inc. (Wes-Garde). Caning contends that it has not agreed to arbitrate the breach of contract claim which is stated in the Application. On November 6, 2000, the court heard oral argument on the motion. For the reasons set forth below, the court grants the motion.
 I. FACTS
The Application seeks an order, pursuant to General Statutes §§ 52-410
and 52-411, appointing an arbitrator and directing Carling to proceed with arbitration. Annexed to the Application, as Exhibit A, is a written agreement entitled "An Agreement Concerning The Redistribution of Stock Ownership, Management Responsibilities And Related Issues With Respect To Carlingswitch, Inc. And Sorenson Lighted Controls, Inc., Et Al," dated December 31, 1979 (Agreement). Also annexed to the Application, as Exhibit B, is an Amendment to the Agreement dated January 1, 1988. Wes-Garde alleges that the Agreement contains various statements concerning arbitration. (Application, ¶ 2.) It also contends that, on multiple occasions, the parties have arbitrated disputes pursuant to the Agreement's terms. (Application, ¶ 3.) Wes-Garde asserts that "[t]here is currently a dispute between the parties with respect to the Agreement." (Application, ¶ 7.) Further, Wes-Garde alleges that, "[s]pecifically, the language of the Agreement provides that "Wes-Garde shall be entitled to purchase "standards' in quantities over 100 at a CT Page 14242 multipher of .27 of `list' price.' This was defined by the Agreement as "90% of the "Best' competitor/distributor multiplier'" (Application, ¶ 7.) Wes-Garde contends that, under the Agreement, Wes-Garde "was granted an indefinite pricing preference from [Carling]" and that the "intent behind the agreement was that Wes-Garde was always to be [Carling's] primary distribution outlet." (Application, ¶ 7.)
Wes-Garde claims that, since the Agreement's inception in 1979, it has received a "multipher equal to 90% of the "Best' multilier offered to distributors who are not in Carling's "million dollar club', for all purchases in excess of 100 pieces." (Application, ¶ 8.) Wes-Garde asserts that Carling breached the Agreement on May 1, 2000 by announcing a new pricing schedule containing quantity discounts, at quantities between 100 and 499 pieces, which violate the Agreement. As a result, Wes-Garde claims that it is no longer receiving the 90% multipher. (Application, 6 9.) In June, 2000, Wes-Garde demanded arbitration of this dispute. Carling has refused to arbitrate. (Application, ¶¶ 10-11.)
 II. STANDARD OF REVIEW
"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted." (Internal quotation marks omitted.)Faulkner v. United Technologies Corp., 240 Conn. 576, 580, 693 A.2d 293
(1997); see also Practice Book § 10-39(a). In adjudicating a motion to strike, the court must construe the facts alleged "in the manner most favorable to sustaining [the complaint's] legal sufficiency." Bohan v.Last, 236 Conn. 670, 674, 674 A.2d 839 (1996). "If facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) Peter-Michael, Inc. v. SeaShell Assoc., 244 Conn. 269, 271, 709 A.2d 558 (1998).
The court's review is limited to the facts alleged in the complaint. See Faulkner v. United Technologies Corp., supra, 240 Conn. 580. "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." NovametrixMed. Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 215, 618 A.2d 25
(1992); Fortini v. New England Log Homes, Inc., 4 Conn. App. 132,134-135, 492 A.2d 545, cert. dismissed, 197 Conn. 801, 495 A.2d 281
(1985). However, "[w]hat is necessarily implied [in an allegation] need not be expressly alleged." Pamela B. v. Ment, 244 Conn. 296, 308,709 A.2d 1089 (1998).
 III. Discussion
Wes-Garde contends that a motion to strike is inappropriate at this CT Page 14243 point and that its allegations concerning the intent of the Agreement should be resolved at a full evidentiary hearing. (Plaintiff's objection, pp. 1-2.) It also argues that such a hearing is necessary to determine whether the dispute "falls within one of the many arbitration clauses" and to ascertain "the intent of the parties in drafting the agreement." (Plaintiff's objection, p. 2.) Wes-Garde asserts also that "the parties intended that all disputes arising out of the agreement would be submitted to arbitration, not simply those narrowly described disputes articulated by the Defendant in its Motion To Strike." (Emphasis in original.) (Plaintiff's objection, p. 2.)
A motion to strike is an appropriate method by which to challenge the legal sufficiency of an application for an order compelling arbitration under General Statutes § 52-410. See Scozzafava v. American StatesIns. Co., Superior Court, judicial district of Danbury, Docket No. 324367 (January 8, 1997, Moraghan, J.); Perchaluk v. Aetna Casualty SuretyCo., Superior Court, judicial district of Fairfield, Docket No. 289234 (February 4, 1992, Thim, J.).
Arbitration is favored as a means of settling private disputes. SeeWhite v. Kampner, 229 Conn. 465, 471, 641 A.2d 1381 (1994). "Nevertheless, "a person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner in which, he has agreed so to do.'" Id., 471-472. "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (Internal quotation marks omitted.) Levine v.Advest, Inc., 244 Conn. 732, 744, 714 A.2d 649 (1998). "Arbitration agreements are contracts and their meaning is to be determined . . . under accepted rules of [state] contract law." (Internal quotation marks omitted.) Id., 745.
The federal arbitration act, 9 U.S.C. § 1-16, also provides guidance concerning contracts that pertain to interstate commerce. The purpose of the act is to ensure that private arbitration agreements are enforced in accordance with their terms. See Levine v. Advest, supra,244 Conn. 747-748. If the agreement is ambiguous as to arbitrability, the court is to resolve the ambiguity in favor of arbitration. See id., 749. The Agreement created "an exclusive distribution agreement for the continental United States. . . ." for an initial eight year term. (Agreement, p. 12.) At various points, it references states and locations in states other than Connecticut as being affected by its terms. (Agreement, pp. 8, 9; Exhibit B2 to the Agreement.) Accordingly, it appears to concern interstate commerce. The principles of contract interpretation which are applicable are the same under the federal act and Connecticut's arbitration statutes. CT Page 14244
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) Tallmadge v. Iroquois GasTransmission System, 252 Conn. 479, 495, 746 A.2d 1277 (2000). Our Supreme Court reiterated, in Tallmadge, that "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 498. Moreover, "[e]specially in the context of commercial contracts, we assume that definite contract language is the best indication of the result anticipated by the parties in their contractual arrangements." Id., 500.
The Supreme Court noted also that it has long held "that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." (Internal quotation marks omitted.) Id., 502. The intent of the parties is to be "determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686,697 A.2d 1137 (1997). Here, there is no allegation made that the Agreement was not the embodiment of the parties' "whole engagement." In its second "WHEREAS" clause, the parties stated that "the parties intend that this Agreement, with its covenants and promises, shall be binding and enforceable. . . ." (Agreement, p. 1.) There is no question that the Agreement was intended to be an integrated document. See Tallmadge, supra, 252 Conn. 503. As in Tallmadge, there is no doubt that WesGarde and Carling intended their Agreement "to be the complete and final expression of their contractual [relationship]." Id.
"Contract language is unambiguous when it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" (Citations omitted.) Levine v. Advest, Inc., supra, 244 Conn. 746. "The rules of construction are applied only if the language of the contract is ambiguous, uncertain or susceptible of more than one construction." Id.
Wes-Garde, as noted above, argues that the parties intended that any CT Page 14245 dispute arising under the Agreement was to be arbitrable. In support of this proposition, it alleges that the parties have arbitrated other disputes on "multiple occasions." (Application, ¶ 3.) As our Supreme Court has noted, "[t]he practical construction indicated by the conduct of the parties over a period of time is evidence of intent. . . . It cannot, however, prove an intent contrary to the plain meaning of the language used." (Citations omitted.) Connecticut Co. v. Division 425,147 Conn. 608, 616, 164 A.2d 413 (1960). There, the court found that the interpretation urged by the defendants was "contrary to the clear intent expressed by the language used." Id., 619. Where "the meaning is doubtful, the law admits evidence of the practical construction of [the] contract by the words, acts and conduct of the parties." Volk v. VolkMfg., Inc., 101 Conn. 594, 600-601, 126 A. 847 (1924); see also Boucherv. Godfrey, 119 Conn. 622, 628, 178 A. 655 (1935).
More recently, the Supreme Court emphasized that "[t]he circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used. . . . It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties." (Citation omitted.) Levine v.Massey, 232 Conn. 272, 279, 654 A.2d 737 (1995). Likewise, the Appellate Court has stated that" [t]he construction of a written document is a matter of law, where the meaning is to be ascertained from the document itself; but where the meaning can be understood only from extrinsic facts, the construction is generally a question of fact. . . ." (Citation omitted; internal quotation marks omitted.) Foley v. Huntington Co.,42 Conn. App. 712, 728, 682 A.2d 1026, cert. denied, 239 Conn. 931,683 A.2d 397 (1996). Where the language of the contract is not definitive, the trier may determine what the parties intended. Id., 731. In arriving at intent, the Appellate Court stated, "it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." (Internal quotation marks omitted.) Id., 730.
As an exception to the doctrine that clear contract language is to be enforced as written, Wes-Garde cited the Supreme Court's decision in Simsv. Honda Motor Co., 225 Conn. 401, 623 A.2d 995 (1993). As the court noted there, that case represented a departure from "the general rule of contract construction that unambiguous contract provisions are to be given their plain meaning without reference to evidence outside the four corners of the agreement." Id., 415. An exception was made there to avoid "frustrat[ing] the purposes of [General Statutes] § 52-572e, which counsels against uncritical enforcement of boilerplate general release language. . . ." Id. Accordingly, the court treated "such language CT Page 14246 differently from how we treat other contractual provisions." Id. The instant case involves neither a boilerplate general release nor the purposes of § 52-572e. The Sims exception to the general rules of contract construction is not applicable here.
In summary, if a court finds, based on its review of the contract as a whole, that it unambiguously does not require arbitration of the dispute at issue, it may not resort to extrinsic evidence, such as references to previous arbitrations or to testimony as to what was intended. Under such circumstances, it may not compel a party to arbitrate a dispute which it has not agreed to arbitrate.
The court has reviewed the Agreement as a whole, as presented with the Application, including the Amendment. The Agreement is a comprehensive and detailed commercial agreement, concerning the ownership and operation of numerous companies. For example, Section 1, entitled "Stock Reallocation and Consideration Therefore," of the Agreement recites the understanding of the signatories as to the reallocation, for stated consideration, of shares of stock in various companies. (Agreement, pp. 2-11.) The Agreement promises the right to lifetime employment in the "several corporations" to two individuals, WTS and WSP[1] Agreement, pp. 8-9, ¶ F; and describes certain debts. (Agreement, pp. 10-11, 6 G.) No agreement to arbitrate any dispute is stated in this portion of the Agreement.
The next section, at pages 12-26, is entitled "Operating Relationship Between Carling and Wes-Garde." At page 12, paragraph A, the parties agreed to arbitrate disputes concerning potential "offending [exceptions]" relating to eight listed "exceptions" to an exclusive distribution agreement between Carling and WesGarde. In contrast, paragraph B, the next paragraph, at pages 13-15, concerning the pricing structure for Wes-Garde, does not contain an agreement to arbitrate concerning its terms. According to the Application, paragraph 7, Wes-Garde bases its claim on this paragraph of the Agreement. At page 13, the Agreement refers to the "90% of "Best' competitor/distributor multipher" about which Wes-Garde now complains in the Application. The 1988 Amendment, Exhibit B to the Application, did not change this paragraph B to call for arbitration as a means of settling disputes arising under it.
The succeeding paragraph, paragraph C, at pages 15-15A, refers to "RWS" and Carling's agreement never to enter the distribution market for certain items and a corresponding agreement by "RCS," Wes-Garde, and "SOLICO" never to enter the business of manufacturing switches or other related component products. Essentially, this paragraph reflects an agreement not to compete in certain areas. Paragraph C does not contain CT Page 14247 an agreement to arbitrate disputes arising thereunder.
The next paragraph, paragraph D, at pages 15A-21, discusses sales "guidelines" for dealing with customers in the marketplace. As set forth in subparagraph b, at pages 16-17, for single orders in quantities ranging between 1000 and 4999, Carling "agrees to maintain a "multipher' of .35 for all OEM customers, approximately 30% over the .27 multipher available to WES-GARDE." (Agreement, pp. 16-17.) Carling agreed to maintain this percentage differential unless, because of its competition's changing pricing structure, to do so "would clearly and significantly erode CARLING'S profitability." (Agreement, p. 17.) In such an event, Carling and Wes-Garde are to "evenly share the necessitated decrease in the price differential resulting from such an erosion." (Agreement, p. 17.) If disagreement ensues "with respect hereto the matter shall be referred to "EFR' or "WTS' for arbitration." Clearly, the "matter" referred to relates to a change in pricing for single orders in quantities of 1000-4999, necessitated by price changes by Carling's competition. The succeeding subparagraph c, at page 17, concerning single orders for 5000 pieces or over, does not contain an agreement to arbitrate. As noted above, in the Application, at paragraph 9, Wes-Garde complains that the alleged breach caused by the new pricing schedule concerns quantities between 100 and 499 pieces.
At pp. 20-21, the parties agreed that "the guidelines and rules as set forth herein" were subject to "enforcement methods," including access to sales orders at either Wes-Garde's or Carling's request. In the event of a violation of "these guidelines or rules," by either company, a transfer of gross profit from the books of the violator to the party which has been harmed is to occur. (Agreement, pp. 20-21.) Clearly, the referenced "guidelines and rules" referred to those set forth in paragraph D, not paragraph B.
The succeeding paragraphs concerning Carling and Wes-Garde, paragraphs E, F, G, H, and I, at pages 21-26, concern other aspects of the parties' relationship, including sale of competing products, existing debt, inventory, "Specials", "Standards", and a "return for credit" policy. None contains an agreement to arbitrate disputes arising thereunder.
At pages 27-33, the Agreement contains terms relating to "The Operating Relationship Between Carling And Solico." This section describes various services which are to be provided by Carling to Solico, in the United States and in Mexico, at "current costs" and at "actual costs," which are defined in the Agreement, at pages 31-32. Since the parties recognized that "the term "costs' is subject to a variety of interpretations," they agreed to arbitration in the event an agreement could not be reached as to "costs." (Agreement, p. 32.) This agreement to arbitrate, like those CT Page 14248 mentioned previously, was limited to the subject matter described. It relates to services to be provided to Solico, not to Wes-Garde.
Later in the same section, at pages 32-33, the parties acknowledged the need for a "fair and enforceable policy" with respect to the services to be provided by Carling to Solico. (Agreement, p. 32.) They agreed to "arbitrate any conflicts or disputes with respect hereto." (Agreement, p. 33.) Clearly, this agreement to arbitrate also related to Carling and Solico, and not to Wes-Garde.
Subsequent portions of the Agreement do not reference arbitration. To the contrary, the parties to the agreement chose a different method of dispute resolution under "Miscellaneous Terms And Conditions," at pages 34-45. In paragraph 5, the agreement discusses the potential sale of RWS's interest in Carling. (Agreement, pp. 36-37.) "RCS" and then "WSP" are provided with the opportunity to purchase "RWS "5" interest. In order to value that interest, in the event that no "arms length" offer is received, "RWS" and the potential purchaser ("RCS" or "WSP") are each to select an appraiser to establish the fair market value of the interest offered for sale. In the event that the two appraisers cannot agree, they are to select a third appraiser "who shall establish market value." (Agreement, p. 37.) The parties could have chosen to direct such an issue to arbitration; they did not do so.
Thus, review of the Agreement as a whole discloses that the parties chose arbitration as a method of dispute resolution in a small number of limited circumstances. The Agreement does not contain a traditional, broad form of agreement to submit all disputes to arbitration. There is no ambiguity concerning which disputes the parties agreed to arbitrate. Clearly, the parties did not agree to submit any and all disputes arising under the Agreement to arbitration. They did not agree to submit to arbitration the type of claim raised by the Application. Under these circumstances, testimony at an evidentiary hearing is not required and may not be considered. The Application does not present a claim upon which relief may be granted.
 CONCLUSION
For the foregoing reasons, Carling's motion to strike is granted. It is so ordered.
BY THE COURT,
 ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT