[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO DISMISS CT Page 15437
The defendant Connecticut Humane Society (C.H.S.) seeks dismissal of the plaintiffs' complaint, dated October 25, 1999, on the ground that the court lacks jurisdiction over the person. In response to the defendant's motion to dismiss, dated December 14, 1999, the plaintiffs filed their objection on October 25, 2000. Oral argument on the motion was heard on October 30, 2000, after which the court scheduled an evidentiary hearing concerning the motion. The parties presented testimony, other evidence, and additional argument at the hearing on November 27, 2000. For the reasons stated below, the court grants the motion.
 I. BACKGROUND
The complaint alleges that the plaintiffs Jacklin and Jeris Alarmani "[a]t all relevant times . . . were owners of a black Chihuahua dog (Chelsie). . . ." (Complaint, ¶ 1.) The plaintiffs allege that Jeris Alarmani brought Chelsie to C.H.S. on October 18, 1999 "in an attempt to find another family which would have more time to spend with Chelsie. . . ." (Complaint, ¶ 3.) They assert that Jeris Alarmani "specifically instructed" C.H.S. that if C.H.S. was "unable to find a home for Chelsie within seven days, that the Plaintiffs would come back and get her." (Complaint, ¶ 4.) The plaintiffs claim that, on October 19, 1999, Jacklin Alarmani telephoned C.H.S. and left a message indicating that she and her family wanted to pick up Chelsie on that day. (See Complaint, ¶ 5.) On the next day, October 20, 1999, it is alleged, Jacklin Alarmani called again and was informed that Chelsie "had been put to sleep." (Complaint, ¶ 6.) The plaintiffs claim that the C.H.S.'s conduct was negligent or reckless and that, as a result they "suffered the loss of Chelsie and suffered severe emotional distress." (Complaint, ¶ 8.)
In its motion to dismiss, C.H.S. argues, pursuant to Practice Book § 10-30 and § 10-31(a)(2), that the court lacks jurisdiction over the person. (Motion to Dismiss, p. 1.) C.H.S. claims that, after October 18, 1999; the plaintiffs were no longer the owners of the dog. (Motion to Dismiss, p. 1.) C.H.S. further contends that by reason of a written release, "all right, title and ownership" to Chelsie had been relinquished. (Motion to Dismiss, p. 1.) As a result, C.H.S. alleges that CT Page 15438 the plaintiffs have no capacity to sue. (Motion to Dismiss, p. 1.)
Submitted with the motion was the affidavit of Sue Grigsby, a C.H.S. employee. In her affidavit, Grigsby averred that she serves as a receptionist at C.H.S.'s walk-in desk for the surrender of animals. (See Grigsby Affidavit, ¶ 2.) According to her, on October 18, 1999, Jeris Alarmani delivered Chelsie to C.H.S., which she accepted on its behalf. (See Grigsby Affidavit, ¶ 3.) She further stated that, "[a]t that time, Mr. Alarmani voluntarily signed the attached release agreement provided to him by me." (Grigsby Affidavit, ¶ 4.) Finally, Grigsby claimed that "[n]o representations of any kind were made to Mr. Alarmani other than as set forth in the release which he signed." (Grigsby Affidavit, ¶ 5.)
Annexed to Grigsby's affidavit was a document entitled "Release Agreement, " which states, in pertinent part, that the signer certified that, on October 18, 1999, he had delivered to C.H.S. an animal "of which I have legal custody and control. [C.H.S.] may give this animal to someone who, in the opinion of [C.H.S.], will give it a suitable home or [C.H.S.], at its discretion, may humanely euthanize the animal." Jeris Alarmani's name and address appear below the signature of the "Owner or Legal Guardian." The Release Agreement also states that it was "ACKN. BY SG." At the hearing, plaintiffs' counsel agreed that the abbreviation "ACKN." should be interpreted by the court as meaning "acknowledged."
With their Objection, the plaintiffs submitted the affidavit of Jeris Alarmani. Therein, Jeris Alarmani repeated the basic allegations of the complaint. He stated that he only brought Chelsie to C.H.S. in an attempt to find another family for her. (See Alarmani Affidavit, ¶ 4.) He added that "[m]y agreement with [C.H.S.] was that I would get Chelsie back if they did not find a suitable home, and therefore I retained ownership, conditioned only on their ability to find a suitable home." (Alarmani Affidavit, ¶ 8.) His affidavit did not address the contents of the Release Agreement. The testimony of witnesses at the evidentiary hearing is discussed below.
 II. STANDARD OF REVIEW
"A motion to dismiss raises the question of whether a jurisdictional flaw is apparent on the record or by way of supporting affidavits."Russell v. Yale University, 54 Conn. App. 573, 577, 737 A.2d 941 (1999). "[The motion to dismiss] shall always be filed with a supporting memorandum of law, and where appropriate, with supporting affidavits as to facts not apparent on the record." Practice Book § 10-31(a). "When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in CT Page 15439 which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Internal quotation marks omitted.) Weidenbacher v.Duclos, 234 Conn. 51, 54 n. 5, 677 A.2d 1378 (1995) "A motion to dismiss may . . . raise issues of fact and would, therefore, require a hearing [to determine the facts] . . . [A]ffidavits are insufficient to determine the facts unless, like the summary judgment, they disclose that no genuine issue as to a material fact exists." (Brackets in original; internal quotation marks omitted.) Standard Tallow Corp. v. Jowdy,190 Conn. 48, 56, 459 A.2d 503 (1983). In this context, the trial court is not required to assume the truth of the allegations in the complaint. See Bradley's Appeal From Probate, 19 Conn. App. 456, 461-462,563 A.2d 1358 (1989). Rather, the purpose of the evidentiary hearing is to permit the court to "determine the disputed facts necessary to decide the jurisdictional issue." Knipple v. Viking Communications. Ltd.,236 Conn. 602, 608, 674 A.2d 426 (1996).
Practice Book § 10-31(a) provides that one basis for a motion to dismiss is lack of jurisdiction over the person. "[I]t is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has . . . some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) Community Collaborativeof Bridgeport, Inc. v. Ganim, 241 Conn. 546, 552-553, 698 A.2d 245
(1997). Standing may be challenged through a motion to dismiss. SeeConnecticut Associated Builders And Contractors v. Anson, 251 Conn. 202,213, 740 A.2d 804 (1999). Where standing is at issue, the party asserting the claim has the burden of proof. See id.
 III. DISCUSSION
C.H.S. argues, citing Vila v. Weston, 33 Conn. 42, 49 (1865), that "a plaintiff must hold title to personal property at the time the action is commenced in order to have a viable claim." (Defendant's Memorandum of Law, p. 3.) In their Objection, the plaintiffs' rely only on Jeris Alarmani's affidavit, which states that "[t]he plaintiffs did in fact retain a proprietary interest in their dog Chelsie." (Plaintiff's Objection, p. 1.)
The scope of a release agreement is a question of contract interpretation. See Sims v. Honda Motor Co., 225 Conn. 401, 408,623 A.2d 995 (1993). "The parol evidence rule is a substantive rule of contract law that prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract." (Internal quotation marks omitted.) Id., 416. "[O]ne purpose of the parol evidence CT Page 15440 rule is to secure business stability." (Internal quotation marks omitted.) Id., 416-417. The rule does not prevent consideration of parol evidence concerning the scope of a release in limited circumstances. See id. "For instance, Connecticut allows extrinsic evidence of the parties' intent to show that a written contract is founded in mistake or fraud." Id., 416.
The use by a party of a form contract document does not, by itself, impose on that party a "sua sponte duty" to direct the signer thereof to important clauses contained in it. See Smith v. Mitsubishi Motors Creditof America, Inc., 247 Conn. 342, 351, 721 A.2d 1187 (1998). To the contrary, a party generally has the duty "to read the terms of an agreement or else be deemed to have notice of its terms." Id., 352. "It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract." Holly Hill Holdings v. Lowman, 226 Conn. 748, 755-756,628 A.2d 1298 (1993). A contract is to be enforced unless it is "voidable on grounds such as mistake, fraud or unconscionability." Id., 756.
In considering the doctrine of mistake, our Supreme Court has referenced the Restatement of Contracts as authoritative. See id. The Restatement provides that a mistake of one party as to a basic assumption may render the agreement voidable by him if "(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." 1 Restatement (Second), Contracts § 153 (1981).
As to fraud, the essential elements have been reiterated frequently: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. . . .A claim of fraud must be proven by clear and satisfactory evidence." (Citation omitted; internal quotation marks omitted.) First Charter National Bank v. Ross,29 Conn. App. 667, 670, 617 A.2d 909 (1992), appeal dismissed,228 Conn. 203, 635 A.2d 796 (1994) (certification improvidently granted).
"The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." (Internal quotation marks omitted.) Smith v. Mitsubishi Motors Credit of America,Inc., supra. 247 Conn. 349. CT Page 15441
With those legal principles in mind, the court turns to the material testimony and evidence presented at the evidentiary hearing. Grigsby testified credibly that she has served for two-and half years as a receptionist at C.H.S. Previously, she was employed for several years as a social worker for the State of Connecticut. In her capacity at C.H.S, she regularly receives animals from their owners. She makes sure that each person understands that, by leaving the animal there, they are releasing it to the defendant. She recalled the occasion on which Jeris Alarmani brought Chelsie to C.H.S. He informed her that Chelsie did not get along with his new guard dog. Grigsby denied that Jeris Alarmani made arrangements to come back and pick up Chelsie. Grigsby did not agree to such an arrangement. She stated that such an agreement was not within her power to I make and, if it had been suggested, she would have so responded.
Grigsby further testified that she filled out the Release Agreement and Jeris Alarmani signed it in her presence without raising any objection to its terms. The Release Agreement was admitted as an exhibit. Grigsby noted that her handwriting and initials appear on the document. The upper portion, which contains data about Chelsie, notes that she "doesn't get along with other dog." (Defendant's Exhibit 1.) The Release Agreement reflects a $30.00 payment to the defendant as a "donation." (Defendant's Exhibit 1.) On cross-examination, Grigsby denied that she had told Jeris Alarmani that such a payment was required in order for C.H.S. to find a home for Chelsie.
The plaintiffs called two witnesses, Richard Johnston, the president of C.H.S., and Jeris Alarmani. Johnston had no personal knowledge of what occurred when Jeris Alarmani brought Chelsie to C.H.S. Jeris Alarmani's testimony repeated the allegations made in the complaint and in his affidavit, which were discussed above. He also stated that he did not believe he had dealt with Grigsby at C.H.S., and that the person he met was younger, heavier, and had blond hair. No support for this contention was offered. Besides being contradicted by Grigsby's testimony, Jeris Alarmani's testimony was contradicted by the fact that Grigsby's initials, "SG, " appear twice on the Defendant's Exhibit 1; under "REC'D BY", which clearly means "received by" and, after "ACKN. BY", which counsel agreed means "acknowledged by." Jeris Alarmani testified that, to him, Grigsby's initials looked like a "5" and a "9," not an "5" and a "G."
Jeris Alarmani further testified that he was never told the dog could be put to sleep and would not have left Chelsie if he had been so informed. He confirmed that Chelsie and the new dog were not compatible. He also confirmed that his signature appeared on the Release Agreement, CT Page 15442 but stated he did not read it because he thought it was simply a receipt.
The language of the Release Agreement is clear and unambiguous. By signing it and giving his dog to the defendant, Jeris Alarmani agreed that C.H.S. could either find a new home for Chelsie or, "at its discretion, may humanely euthanize the animal." (Defendant's Exhibit 1.) No complicated legal terms were involved. No claim is made that the term "euthanize" was misunderstood. In fact, the quoted language appears in the second of only three sentences on the printed form. The form is prominently entitled "Release Agreement." There is no doubt about its meaning. On behalf of Jacklin Alarmani and himself, Jeris Alarmani relinquished all right, title, and interest in or to Chelsie when he signed the Release Agreement and left her with the defendant.
Moreover, no acceptable reason has been advanced for not enforcing the Release Agreement according to its terms. Notice of the contents of a document is to be imputed to a person who negligently fails to read a contract affecting his interests. See First Charter National Bank v.Ross, supra, 29 Conn. App. 671. "It is within the trial court's discretion to determine whether, under the circumstances, the defendant was not diligent in trying to read the documents [he] signed and whether to charge [him] with knowledge of their contents." Id. In contrast to the situation in First Charter National Bank v. Ross, where a husband presented to his wife papers to sign and misled her as to their contents, the document here was not presented in a manner or at a time designed to discourage Jeris Alarmani from looklng at it. See id. The court does not find merit in the claim that the plaintiffs were misled. If anything, Jeris Alarmani was not diligent in reading the Release Agreement he signed.
The plaintiffs may not be excused from the consequences of the Release Agreement due to mistake because the court finds the defendant did not cause any mistake and did not have reason to know of any mistake by the plaintiff. Furthermore, the plaintiffs have not shown that the agreement was procured by fraud. Finally, enforcement of the Release Agreement would not be unconscionable because the Release Agreement is not an unfair agreement, nor do plaintiffs claim it to be. Therefore, the Release Agreement is not voidable as a matter of law and the court must enforce its terms.
Based on those terms, the court finds that, after the signing of the Release Agreement on October 13, 1999, the plaintiffs no longer owned Chelsie. By the signing of the Release Agreement, the plaintiffs relinquished Chelsie to the C.H.S., giving C.H.S. the discretion to either find her a home or euthanize her. Accordingly, the plaintiffs no CT Page 15443 longer had any right to or interest in Chelsie. Under these circumstances, the plaintiffs have no standing to sue C.H.S.
 CONCLUSION
Based on the reasons stated above, the motion to dismiss is granted. It is so ordered.
BY THE COURT,
Robert B. Shapiro Judge of the Superior Court